368 So.2d 156 (1979)
RIVERLAND OIL MILL, INC., Plaintiff-Appellee,
v.
UNDERWRITERS FOR LLOYD'S, NEW YORK, Defendant-Appellant.
No. 13767.
Court of Appeal of Louisiana, Second Circuit.
January 16, 1979.
Rehearing Denied February 28, 1979.
Writs Refused April 23, 1979.
*157 Brown, Wicker & Lee, Monroe, for defendant-appellant.
Thompson, Sparks, Cudd & Dean, Monroe, Wallace & Southerland, Benton, for plaintiff-appellee.
Before HALL, MARVIN and JONES, JJ.
En Banc. Rehearing Denied February 28, 1979.
JONES, Judge.
Appellants, Leighton H. Stevens, Wayne D. Moore, John N. Gilbert, Jr., H. Fletcher Eggert, Jr., L. Palmer Brown, III, Serena Merck, Joseph C. Cornwall, Stevens Peale, Hugh C. O'Rourke and Miles W. Rehor, underwriters for Lloyd's of New York and Lloyd's, New York, hereinafter referred to as defendant, fire insurer of plaintiff, Riverland Oil Mill, Inc., a cottonseed oil mill, appeal a judgment against it for damages caused by fire to 7,352 tons of cottonseed. The plaintiff answers the appeal seeking penalties and attorney's fees based upon defendant's arbitrary and capricious failure to pay an amount it admittedly owed. We award penalties and attorney's fees, and as amended, affirm the judgment.
On August 15, 1975, a fire occurred in Seed House No. 4 of plaintiff's cottonseed oil mill located in Bossier City. The plaintiff contends there were 7,352 tons of seed in Seed House No. 4 at the time of the fire. Defendant contends there were 6,020 tons of seed in the seed house at the time of the fire. The fire commenced at approximately 7:00 P.M. and burned for three hours and for several hours thereafter continued to smoulder. Several units of the Bossier City Fire Department were called to the fire, and many gallons of water were poured upon the seed. One unit of the fire department remained at the site of the fire until 10:00 A.M. the following day. Defendant's policy provided full coverage on the loss conditioned upon the insured having made *158 accurate reports of its inventory each month to defendant. Premiums were based upon the inventory reported. The inventory of a cottonseed oil mill consists of the cottonseed and the products produced from it. The products produced from the seed are oil, meal, hulls, linters and motes.
The inventory of cottonseed in an oil mill is determined by deducting the tons of seed crushed by the presses from the tons of cottonseed received by the mill. The standard practice in the industry for determining the number of tons crushed by the mill is to divide the number of pounds of cottonseed oil produced (this is determined by measuring the gallons of oil produced and multiplying it by the known weight per gallon) by the oil factor of the cottonseed being crushed. The oil factor is the number of pounds of oil contained in a ton of seed and is determined by a chemical analysis of the seed.
In July, 1975, Tom Poulos, secretary-treasurer of plaintiff, in a routine trip to plaintiff's mill, reviewed its production records and observed that it had been reducing its inventory based upon too low an oil factor (testified by him at 250 pounds per ton). A 300 pound oil factor is the rule of thumb in the industry. Mr. Poulos, upon making this observation, concluded there were substantially more cottonseed in the inventory of the plaintiff than the books reflected. To understand Mr. Poulos' observation, one must recognize that by using an oil factor of 250 pounds per ton, a larger number of tons would be attributed to manufacturing the daily production of oil than in fact had been used if the oil factor was substantially above 250 pounds per ton. Mr. Poulos realized that because plaintiff's inventory had been relieved (deducted from), based upon a low oil factor, that substantially more tons were removed from the inventory than had in fact been used in the production of the oil. For this reason there was substantially more seed located at the plant than reflected by the books. This meant there were more products available to be produced at Riverland from the existing inventory than reflected by the books of the company. Mr. Poulos, for this reason, advised Mr. Taylor, plaintiff's general manager, to take the necessary steps to figure out the correct amount of products available for sale. Mr. Taylor had an oil analysis run on the seed then being crushed and found they had an oil factor of 295 pounds. Mr. Taylor, on or about August 13, 1975, advised Mr. Richard Campbell, who was serving as office manager during the vacation of Mr. Posey, plaintiff's regular office manager, to adjust the cottonseed inventory based upon an oil factor of 295 pounds. Mr. Campbell determined from the books of the plaintiff the number of pounds of oil produced from May 1, 1975 (this being the commencement of plaintiff's fiscal year) until August 4, 1975. He divided the total number of pounds of oil produced by the oil factor of 295 pounds and determined the amount of tons which the inventory should have been reduced. He further determined that the inventory had actually been reduced by 1,332 tons in excess of this amount. On the morning of August 15, 1975, to correctly reflect the existing cottonseed inventory, Mr. Campbell added to the inventory reflected by the books, 1,332 tons, resulting in the inventory then showing the amount of 7,888 tons of cottonseed.
Following this adjustment of inventory on the morning of August 15, 1975, that evening at 7:00 P.M. a fire occurred in Seed House No. 4. All of plaintiff's seed were stored in Seed House No. 1 and No. 4. At the time of the fire, there were 457 tons of seed in Seed House No. 1 and 79 tons of seed had been removed from storage and was directly involved in the production process. There were, at the time of the fire, located in Seed House No. 4 as shown on the books of the plaintiff as adjusted that day, 7,352 tons of cottonseed.
Plaintiff made its fire loss claim based upon the inventory as adjusted by the addition of 1,332 tons. Defendant contended the inventory adjustment was unwarranted and the correct amount of plaintiff's inventory was the amount reflected by the books prior to the adjustment, and in this dispute with regard to the correctness of the inventory is found the basis of this litigation.
*159 The plaintiff, in compliance with reporting requirements of its insurance policy, reported the number of tons of cottonseed as shown on its books on July 31, 1975, which was before the 1,332 ton adjustment, and for that reason, the report reflected approximately 1,300 tons of seed less than plaintiff now contends actually existed in the inventory on July 31. Under these circumstances, the following co-insurance provision of the policy would be applicable to the plaintiff's fire loss in the event plaintiff prevails in its contention that the 1,332 ton adjustment to its inventory was properly made:
"F. FULL REPORTING: The liability of the Company shall not exceed that proportion of loss (meaning the loss, as provided in the Excess Clause above, at the location involved), which the last reported value filed prior to the loss, less the amount of any specific insurance reported, at the location where the loss occurs, bears to the total actual cash value, less the amount of specific insurance, if any, at that location on the date for which the report was made."
The defendant, while denying the correctness of plaintiff's adjustment, contends that in the event it is held to have been correctly made, that based upon the co-insurance provision the plaintiff is only entitled to 81% of its loss. Defendant further contends the 81% should be based upon the gross loss, this being the value of the total number of tons involved in the fire before any deduction therefrom is taken for the salvage value of damaged seed. The plaintiff contends the correct co-insurance percentage is 89% and it is to be calculated upon plaintiff's net loss, this being determined by deducting from the gross value of the seed involved in the fire the salvage receipts from the damaged seed which were utilized after the fire.
The trial judge concluded the plaintiff's inventory adjustment was proper and that there were 7,352 tons of seed in Seed House No. 4 at the time of the fire. The trial judge further concluded that the plaintiff's method of applying the co-insurance factor was correct.
Defendant assigns as error these trial court determinations and further complains of the trial court's allowance of $18,524 conversion costs on damaged seed as a recoverable expense.
In November, 1975, defendant prepared a Proof of Loss and submitted it to plaintiff for approval. It was based upon an inventory of approximately 1,000 tons less than plaintiff contends was in Seed House No. 4 at the time of the fire. The Proof of Loss recognized that defendant owed plaintiff $917,031.00, less $250,000.00 which defendant advanced plaintiff immediately following the fire, or in other words, recognized a liability of defendant to plaintiff of $657,031.00. The plaintiff refused to sign the Proof of Loss because it did not cover his contended loss and filed suit. The defendant failed to pay the amount shown on Proof of Loss submitted and plaintiff contends defendant's failure to pay this amount is arbitrary and capricious and results in it being liable for penalties and attorney's fees.
The trial court rejected plaintiff's claim for penalties and attorney's fees, giving as reason therefor "in view of the unusual inventory adjustments occurring on the day of the fire and the inconclusiveness of plaintiff's total loss until the whole matter was liquidated, the Court is of the opinion that the plaintiff is not entitled to attorney's fees and statutory penalties." Plaintiff assigns as error the trial court's rejection of its claim for attorney's fees and penalties.
The issues presented are (1) plaintiff's inventory at the time of the fire (2) conversion cost award of $18,524 (3) calculation of the co-insurance factor and (4) penalties and attorney's fees.

INVENTORY AT THE TIME OF THE FIRE
The proper method to efficiently determine the number of tons of cottonseed being utilized in the daily production of cottonseed oil is by the use of an oil factor determined by chemical analysis. During the production year of 1975, Mr. Posey, *160 plaintiff's office manager, determined the number of tons of cottonseed being used in the daily production process by calculating the number of hours that plaintiff's four cottonseed oil presses operated, which information he obtained from the oil mill's daily superintendent's reports. Mr. Posey made the determination of the number of tons of cottonseed consumed in the daily production based upon available information of the number of tons of cottonseed the presses were capable of utilizing. The oil factor was apparently determined and placed in the records based upon the number of pounds of oil produced, divided by the number of tons of seed utilized, computed upon press operations. The reduction in the inventory based upon the press tonnage calculation caused a misstatement in the inventory. There were more tons of cottonseed in plaintiff's warehouse than were reflected on its books.
Plaintiff offered the testimony of a well-qualified oil mill expert of long experience who analyzed plaintiff's production records for 1975, as well as the three prior years. This expert testified that by using oil factors reflected upon the chemical analyses that were in the records of the company, that he concluded the inventory had been excessively reduced by 1,332 tons during the period between May 1 and August 15, 1975. His testimony reflects that excessive reduction commenced in May, 1975 and that by July 11, 1975, the inventory had been excessively reduced by 1,269 tons. His calculations indicate that plaintiff's correct inventory as of August 15, 1975 was 7,888 tons. The trial judge was impressed by this witness and stated "the testimony of the expert witness, William T. Campbell, is important. He made a complete review of the plaintiff's operation and determined that the adjustment to the inventory was proper, despite painstaking cross-examination, he remained steadfast in his conclusion." The trial judge was even more impressed, as we are, by the evidence adduced at trial as to the seed destroyed in the fire, salvaged following the fire, and left on the ground as unrecoverable, which substantiated the plaintiff's contention as to the cottonseed tonnage existing in Seed House No. 4 at the time of the fire.
Witnesses testified that from 200 to 856 tons of cottonseed were actually destroyed by fire. The seed that remained were saturated with water and in order to salvage as many of them as possible, they were removed from the seed house and some of them were stored on surrounding land, others were carried to storage sites in Natchitoches, New Roads and Opelousas, and others were carried to the dump. A salvage specialist was employed to handle most of these operations. It was stipulated that the salvage operator hauled 4,738 tons of seed from the plaintiff's premises. 3,600 tons of these seed were crushed at a Natchitoches oil mill. In connection with the removal of these large volumes of seed from the seed house to the storage area and into the vehicles used to haul them to other locations, there were large numbers of seed placed on the ground that were not recoverable in the salvage process. The seed that remained on plaintiff's premises that were recoverable were crushed by it. Plaintiff produced 1,829 tons of products from the damaged seed that were not removed by the salvage operator from the premises. This was established by the testimony of Mr. Posey, plaintiff's office manager.
The seed which were crushed by the Natchitoches mill contained approximately 200 pounds per ton weight manufacturing loss and they were as good or better than the salvaged seed crushed by plaintiff. Under these circumstances, in order for plaintiff to produce from the salvaged seed products weighing a total of 1,829 tons, it actually crushed seed weighing in excess of 2,029 tons. Adding the 2,029 tons crushed to the 4,738 tons hauled off, plaintiff has accounted for 6,767 tons of seed that were initially located in Seed House No. 4, leaving 585 tons of its adjusted inventory unaccounted for.
We are unimpressed by defendant's contention that the testimony of Mr. Posey as to the after fire production is unbelievable because of his conflicting testimony as to his method of reducing the inventory.
*161 While Mr. Posey did indicate that he reduced the inventory by the use of an oil factor and later explained that this reduction was based upon press production, this conflict of testimony does not establish that Mr. Posey misrepresented the facts concerning the actual tons of products produced by plaintiff's mill from the damaged seed. We note that defendant's adjuster, while attempting to deny the number of tons of products produced from these damaged seed by plaintiff's mill, willingly accepted the value of these products as in excess of $240,000 for the purpose of deducting salvage value from plaintiff's total loss.
The defendant's contention that the oil factor reflected on laboratory analysis found in plaintiff's records has the effect of disproving the tonnage of products produced after the fire is without merit for the reason that evidence established that oil factor determinations on damaged seed are unreliable. We further observe it was not established that the laboratory analyses were actually made on the seed which were used by the plaintiff in producing the 1,829 tons of products.
Plaintiff's expert, Coleman, expressed the opinion based upon his past experience of burning cottonseed hulls that 570 tons of cottonseed would have burned in the three hour fire. Plaintiff offered the testimony of another expert who performed cottonseed burning tests under controlled conditions. He testified the three hour fire would have consumed between 428 and 856 tons of seed. Plaintiff's expert, Coleman, expressed the opinion that 270 tons of unrecoverable cottonseed were left on the ground in the storage area and on the runways used for the front-end loaders and tractor-trailer trucks. This opinion was based upon information supplied to him on the area of ground where the cottonseeds were placed, the approximate depth of the seed left on the ground not recoverable because they had been pressed into the soil by the wheels of vehicles used in the salvage operation. The trial court concluded that the testimony of these experts as to the cottonseed burned and left on the ground, taking into consideration with the seed hauled off by the salvage operator and the seed crushed by plaintiff, established that plaintiff had at least 7,352 tons of seed in Seed House No. 4 at the time of the fire. We find there is ample evidence in the record to support the trial judge's finding as to the volume of cottonseed involved in the fire and it shall not be disturbed. Canter v. Koehring, 283 So.2d 716 (La.1973); Aleman v. Lionel Favret Company, 349 So.2d 262 (La.1977).

CONVERSION COST
The defendant asserts on appeal the trial court erred in awarding plaintiff $18,524 extra conversion cost as an expense which related to plaintiff's conversion of over 2,000 tons of damaged cottonseed into 1,829 tons of products valued at $240,666.38. Defendant does not contend that extra conversion costs required to convert damaged seed into saleable products is not an item of expense properly considered in determining the loss covered by the policy. The defendant argues there is no evidence in the record to support the trial judge's determination that additional conversion costs were in fact incurred. We find the trial judge's award for extra conversion costs is supported by the testimony of Mr. Posey, plaintiff's office manager, establishing that the plaintiff incurred additional conversion costs in connection with processing of the damaged seed. The conversion costs determination is also supported by documents in the records wherein defendant's adjuster recognizes the additional conversion cost in the amount of the award. 
CO-INSURANCE
The insurance policy required plaintiff to report its correct inventory to the insurer on July 31, 1975. Plaintiff failed to do this and for that reason it was not entitled to the full amount of its loss. The insurance policy contains the following provision which has the effect of reducing the percentage of plaintiff's claim under circumstances wherein it failed to report the full inventory to the insurer, to-wit:

*162 "The liability * * * shall not exceed that proportion of the loss * * * which the last reported value filed prior to the loss * * * bears to the total actual cash value * * * on the date for which the report was made."
The fraction for which this policy provision provides is stated as follows:

 On July 31, 1975 - Last
 reported value of stock
 prior to loss ------------$1,261,854.00
Total actual cash value = 89.054%
of stock on date of last
report -------------- = 1,416,947.01

The parties agree as to the value of the stock reported (the numerator) and there is a dispute as to the value of the stock actually on hand on reporting day (the denominator). The trial court found this value to be $1,416,947.01. This value includes the value of products on hand other than cottonseed. There is no dispute as to the value of the products on hand other than cottonseed. This determination was based upon the testimony of plaintiff's expert, Coleman, that 7,286 tons of seed were contained in plaintiff's inventory on report day. The Court accepted plaintiff's evaluation of $25 per ton for 457 tons of bad seed contained in the inventory which was not involved in the fire, as this was the price plaintiff received for it when it was sold in August, 1975. Since the clause in the policy provided for the actual value of the inventory on reporting date, this determination as to the value of the tonnage of bad seed is as contemplated by the policy. The value per ton of the seed, other than the bad seed, is accepted by plaintiff and defendant as $168.23 per ton. We conclude the factual determination of the trial judge as to the value of the inventory on report day is supported by the record and that the co-insurance factor was properly determined to be 89.054%.
Defendant contends the loss to which the co-insurance percentage is to be applied is the total value of the cottonseed involved in the fire. The plaintiff contends the loss to which the percentage is to be applied is the total value of the seed involved in the fire less the salvage proceeds obtained from the disposition of the damaged seed. The authorities cited by defendant do not discuss this issue, and therefore, do not support the defendant's contentions. The trial court accepted the plaintiff's contention and applied the co-insurance percentage to the net loss. This method of performing the calculation was approved in the decision of Rolane Sportswear, Inc. v. United States Fidelity & Guaranty Company, 407 F.2d 1091 (6th Cir. 1969). Defendant's claim manager testified that this was the correct method of applying the co-insurance clause.
We agree that the co-insurance percentage should be applied to the net loss. Otherwise, plaintiff would be penalized for failure to report on the value of the salvage which the issuer is not required to pay.
Plaintiff's loss is to be determined by multiplying the total number of tons of cottonseed involved in the fire (7,352 tons) by the stipulated value of each ton ($173.34), less the salvage receipts times the co-insurance percentage, plus expenses incurred by plaintiff in connection with the salvage operation. Plaintiff's fire loss and credit applicable to it can be calculated as follows:

Tons of seed involved in fire - 7,352
Stipulated value of each X× $173.34
ton of seed
 _______
TOTAL VALUE OF SEED INVOLED
 IN FIRE ------------------$1/74,395.68
Less Salvage Recovery:
Received from salvage
operator Reynolds ----$163,544.25
Received from products
produced by plaintiff
from fire damaged
seed ---------------$240.666.38
TOTAL SALVAGE RECOVERY -- 404.210.63
 __________
 $ 870,185.05
Percentage of the loss to which plaintiff
is entitled under penalty provision
of the insurance policy wherein
it is penalized for failure to report
full inventory ------------------- 89.054%
 ____________
 $ 774,934.59
Plaintiff's salvage expenses:
Freight on Mea ------- $ 747.00
Salvage expenses incurred
by plaintiff ---- 6,331.00
Extra conversion costs
expended by plaintiff

*163
in connection with
damaged seed ------- 18.524.00
 _________
 TOTAL ------------- + 25,602.00
 ____________
 $ 800,536.59
(we add back the salvage received
from Reynolds in order that the payment
may be hereafter shown as
a deduction) ------------------- 163,544.25
 ------------
 964,080.84
PAYMENTS RECEIVED FROM DPENDANT:
 September, 1975 -------$250,000.00
January, 1976 (received
from salvage operator
Reynolds) ----------- 163,544.25
January, 1976 ----------- 16,959.00
October, 1976 ----------- 332,587.00
May 3,1977 ----------- 11,435.75
Sept. 8, 1977 ---------- 33.698.00
 ___________
 TOTAL ------------- 808.224.00
 ___________
TOTAL amount to which plaintiff was
entitled and for which trial court
rendered judgment-------------- $ 155,856.84

PENALTIES AND ATTORNEY'S FEES
Plaintiff contends defendant has been arbitrary and capricious in failing to pay the undisputed portion of its fire loss and for that reason is liable to it for 12% penalties and reasonable attorney's fees under the provisions of LSA-R.S. 22:658.[1]
Defendant argues it never received a satisfactory proof of loss from plaintiff and this is an essential condition precedent to the application of the penalty statute.
Defendant further contends that because of the inventory adjustment that was made on the date of the fire, that it was not arbitrary and capricious for failing to make payment under the policy in any manner other than it did.
The fire was promptly reported to defendant and its adjuster arrived at plaintiff's oil mill and commenced his investigation within two or three days after the fire. Plaintiff made available to defendant's adjuster all of its books and records, and cooperated with him in making arrangements to salvage the damaged cottonseed. The adjuster acknowledged he had received full cooperation from the plaintiff.
On November 24, 1975, defendant's adjuster wrote plaintiff a letter and enclosed with it an exhibit showing his calculation of plaintiff's loss and enclosed a prepared Proof of Loss to be executed by plaintiff. The Proof of Loss reflected plaintiff's claim to be $917,031.00. The loss calculation was based upon 6,369 tons of seed being involved in the fire which was approximately 1,000 tons less than the amount of seed which plaintiff contends was involved in the fire. The Proof of Loss took credit for the $250,000.00 which defendant had earlier advanced to the plaintiff and was, therefore, prepared reflecting a final claim of $667,031.00. The exhibit and letter of transmittal provided that all salvage would accrue to the insurer. Defendant's adjuster admitted in his deposition that he had authority from defendant's claim manager to prepare the proof and was advised that payment would be made upon the execution of the Proof of Loss by plaintiff. The plaintiff refused to execute the Proof of Loss because it failed to include all of the cottonseed that it contended was involved in the fire.
The Proofs of Loss required by LSA-R.S. 22:658 are not required to be in any particular form and may even be verbal. The purpose of the requirement of the Proof of Loss is to advise the insurer of the facts of the claim. In the case of Gatte v. Coal Operators Casualty Co., 225 So.2d 256 (La.App. 3rd Cir. 1969), reversed on other grounds, 256 La. 325, 236 So.2d 285 (1970), the court stated with regard to penalties and attorney's fees:

*164 "One who claims penalties and attorney's fees under LSA-R.S. 22:658 has the burden of proving submission to the defendant of `satisfactory proofs of loss' as a necessary predicate to a showing that the defendant was arbitrary, capricious or without probable cause in failing to pay benefits. Steadman v. Pearl Assurance Company, supra [242 La. 84, 134 So.2d 884]; Moore v. St. Paul Fire & Marine Insurance Company, La.App., 193 So.2d 882 (3rd Cir. 1967); Soulier v. Raymond, La.App., 177 So.2d 651 (4th Cir. 1965); Wilkins v. Allstate Insurance Company, La.App., 173 So.2d 199 (1st Cir. 1965); Sbisa v. American Equitable Assurance Company, 202 La. 196, 11 So.2d 527, 145 A.L.R. 332 (1942); Daigle v. Great American Indemnity Company, 70 So.2d 697 (1st Cir. 1954). However, it is not necessary that the proof of loss be in writing, or in any other formal style, so long as the defendant has actual knowledge of the facts, Moore v. St. Paul Fire & Marine Insurance Company, supra, and cases cited therein." p. 258.
In the case of Paul v. National American Insurance Co., 361 So.2d 1281 (La.App. 1st Cir. 1978), the court stated:
"Notwithstanding the rule of strict construction applicable in cases of this nature, our jurisprudence establishes that the pertinent statute does not require written proof of loss, or any other formal style of proof; it is required only that the insurer have actual knowledge of the facts. Artigue v. Louisiana Farm Bureau Mutual Insurance Company, 339 So.2d 880 (La.App. 3rd Cir. 1976); Wilkins v. Allstate Insurance Company, 173 So.2d 199 (La.App. 1st Cir. 1965). In this case, appellant was fully apprised of the claim through Pittman's personal investigation of the premises and the list of contents furnished by Insured. Pittman's testimony establishes conclusively that the delay in payment was not due to any fault of Insured." p. 1284.
The information available to defendant's adjuster and incorporated by him in the exhibit attached to the Proof of Loss prepared by him satisfied the LSA-R.S. 22:658 requirement of proof of loss. The defendant having recognized plaintiff's claim to the extent set forth in the Proof of Loss was required by LSA-R.S. 22:658 to pay the amount therein set forth within 60 days.
In Sensat v. State Farm Fire & Casualty Co., 176 So.2d 804 (La.App. 3rd Cir. 1965), the plaintiff's home was severely damaged by fire. At the time of the loss, the property was insured by a policy issued by the defendant with limits of $35,000. The adjuster for the defendant insurance company obtained an appraisal of the damage in the amount of $25,225.31 and offered to settle with plaintiff on that basis. However, the plaintiff contended the house was a total loss and that he was entitled to the limits of the policy. The defendant did not pay the amount of its estimate. The court held the defendant was liable for penalties and attorney's fees and made the following statement with respect to the defendant's action:
"We are unable to find that the defendant-insurer was anything less than arbitrary and capricious in failing to pay or tender payment of the amount of $25,225.13 after having fully investigated the loss. The defendant did not at that time dispute that this amount was due, but conditioned an offer of payment of this amount on plaintiff's accepting it in full settlement of the claim. This offer to settle the claim was in no manner a tender of payment as contemplated by R.S. 22:658, for a tender of payment must be absolute and unconditional. Fruge v. Hub City Iron Works, Inc., La.App. 3rd Cir., 131 So.2d 593." p. 807.
The court stated "under these circumstances, where an insurer fails to tender or pay within the statutory period that part of its liability for which without dispute it is liable, thus causing an insured to retain an attorney to collect this undisputed portion of the liability as well as that portion as to which there may be a bona fide dispute, the penalty statute requires the insurer to be subjected `to a penalty, in addition to the amount of the loss, of 12% damages on the *165 total amount of the loss * * * together with all reasonable attorney's fees for the prosecution and collection of such loss.'"
In Benoit v. American Mutual Insurance Co. of Boston, 236 So.2d 674 (La.App. 3rd Cir. 1970), plaintiff sustained a fire loss damaging his home and the contents. There was initially a strong suspicion of arson. He instituted suit against the insurer for the amount of his loss, together with penalties and attorney's fees. Defendant obtained an estimate of the damage to the structure in the sum of approximately $20,287.61 but never paid this amount even after the suspicion of arson proved unfounded. The defendant was fully aware because of its previous estimate that the damage to the house was at least $20,287.61, "yet the defendant did not tender payment for the loss of the structure until October 1, 1969" (the fire occurred on January 14, 1969). The Court made this comment concerning the defendant's estimate of the loss sustained by plaintiff:
"Since the defendant had made its own estimate of the damage to the structure, it should at least have tendered $20,287.61, the amount of the estimate, to the plaintiff within 60 days of June 26, 1969. After that date there was no excuse for the defendant's failure to do so, for it had learned conclusively on that date that the defense of arson was no longer available. Its failure to do so before October 1, 1969, was arbitrary and capricious, and penalties and attorney fees must be assessed as to the amount due for the loss of the structure." p. 677.
In the case of Dumond v. Mobile Insurance Co., 309 So.2d 776 (La.App. 3rd Cir. 1975), plaintiff's mobile home was a total loss as result of wind damage. He filed suit for the total loss plus penalties and attorney's fees. The trial court held that the mobile home was a total loss and awarded plaintiff the face amount of the policy of $8,000 together with penalties and attorney's fees, and its decision was affirmed on appeal with the court making the following statement with regard to penalties and attorney's fees:
"The final specification of error by the defendant is that the trial judge erred in awarding penalties and attorney's fees when there was no evidence to support the conclusion that the defendant had acted arbitrarily and unreasonably. We find, to the contrary, that there was in fact sufficient evidence that the defendants had acted arbitrarily and capriciously in denying payment of the insurance claim to plaintiff. The defendant obtained bids from Mr. McConley in the amount of $4,500.00 and from Mr. St. Julian in the amount of $1,632.96, and sent to the plaintiff a proof of loss form from the insurance company based upon the figure of $1,382.96 as a complete and final settlement for his loss. This figure was based on the bid received from Mr. St. Julian in the amount of $1,632.96, less the $250.00 deductible provided for in the insurance policy. This proof of loss form was never executed by the plaintiff as he informed the insurer that this amount was not acceptable and he desired payment for the total loss of his mobile home. The record indicates that the defendant never tendered to the plaintiff a draft or check for the amount of its own estimate of the damage to the structure." p. 778.
See also Cox v. Southwestern Electric Power Co., 348 So.2d 1252 (La.App. 2d Cir. 1977).
The only payments that plaintiff received on its fire loss within the months of December, 1975 and January, 1976, following its receipt of defendant's letter of November 24 containing the Proof of Loss were:

$ 16,959.00 - Received by plaintiff from defendant
in January, 1976
$163,544.25 - Received from salvage operator Reynolds
in January, 1976
$240,666.38 - Received and retained from products it
produced from salvaged seed
-----------
$421,169.63 - TOTAL

The Proof of Loss prepared by defendant contemplated that it was to receive the salvage, and therefore, salvage funds received by plaintiff within 60 days could be attributed to payment of the admitted loss:

*166
Claim admitted __________________$667,031.00
Funds received __________________$421,169.63
Unpaid within 60 days
of proof of loss _________________$245,861.37

The defendant made no further payment to the plaintiff on its fire loss until October 1976 when it deposited $332,587.00 in the registry of the Court.
The defendant's failure to pay what it admittedly owed until almost a year after its preparation of the Proof of Loss constitutes an arbitrary and capricious failure to pay within the contemplation of LSA-R.S. 22:658.
The defendant, through its salvage operator Reynolds, removed 4,738 known tons of cottonseed of a known value of $173.34 per ton from plaintiff's oil mill shortly after the fire. Defendant was advised of the volume of seed removed by Reynolds and of its value by a report from its adjuster dated September 30, 1975. This knowledge of the defendant can be construed to constitute Proof of Loss. Gatte v. Coal Operators Casualty Co., supra; Paul v. National American Insurance Company, supra. The defendant's claim manager testified that defendant had full control over the cottonseed hauled off by the salvage operator engaged by it. He testified the defendant was under no obligation to pay any portion of the fire loss until the entire loss, including the portion in dispute, could be determined. The position of defendant's New York claims manager, with regard to payment of the undisputed portion of the claim, is contrary to the Louisiana jurisprudence. The value of these seeds was $821,284.92 and the only payment made that could have been attributable to them before October, 1976 was the $250,000 advance in September, 1975 and the $163,544.25 payment by salvage operator Reynolds in January, 1976, thereby leaving $407,740.67. This sum was due and unpaid from January, 1976 until October, 1976, when the $332,587 was deposited in the registry of the Court and this deposit did not fully liquidate the value of the damaged seed removed from plaintiff's premises shortly after the fire. While the defendant had every right to withhold payment on the disputed cottonseed, its failure to pay for almost one-half of the value of the seed removed by it for more than one year further establishes that the defendant was arbitrary and capricious in its failure to pay within the contemplation of the statute.
On the plaintiff's total loss of $964,080.84 (the value of total seed involved in fire loss less value of salvage produced by plaintiff) defendant paid $430,503.25 by February 1, 1976 and no penalties are due on the amount so paid. We assess the defendant with 12% on the sum of $533,577.59 which was not paid before February 1, 1976, the amount of the penalties assessed being $64,029.31. The plaintiff is also entitled to attorney's fees. There is evidence that the plaintiff had paid their attorneys in legal fees and expenses $16,748.81 in connection with this litigation as of trial date. We have determined that $17,500 is a reasonable sum to compensate plaintiff's attorneys for services rendered by them in this complex litigation, the trial of which lasted seven days.
The plaintiff asserts that it is entitled to legal interest on the sum of $11,435.75 deposited in the registry of the Court on May 3, 1977 and to legal interest on the sum of $33,698 deposited in the registry of the Court on September 8, 1977 from the date of judicial demand until the date of the deposits. The trial court's judgment of May 1, 1978 gives the defendant credit on plaintiff's award for the $11,435.75 and in this respect the judgment reads as follows:
"That there be judgment herein in favor of the plaintiff * * * in the full sum of $200,990.59 plus legal interest as provided by law, less the $11,435.75 deposited in the registry of the Court by defendant."
We construe the language of this judgment to provide for legal interest upon the $11,435.75 credit and it needs no clarification. The judgment of the trial court of May 1, 1978 was amended by judgment rendered on a Motion For a New Trial on July 27, 1978 to provide credit for defendant's deposit of $33,698. This amendment reads as follows:

*167 "IT IS ALSO ORDERED, ADJUDGED AND DECREED that the Motion For a New Trial filed by the defendants herein be granted and that accordingly defendants be given a credit of $33,698 against the principal amount of the judgment and that this sum currently on deposit in the registry of the Court be and it is hereby ordered paid to Riverland Oil Mill, Inc."
The language of this paragraph of the amending judgment providing for this credit has the effect of deducting the credit from the principal amount of $200,990.59 before the legal interest commenced to apply to the principal amount of the judgment, and for that reason, we find the plaintiff's assignment of error to the effect that it is being denied legal interest on this sum from date of judicial demand to date of deposit is correct.
In order to correct this error, we add an additional paragraph to the judgment of July 27, 1978 as follows to-wit:
IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Motion for a New Trial filed by the plaintiff be granted and that there be judgment herein in favor of the plaintiff, Riverland Oil Mill, Inc., and against the defendants, LEIGHTON H. STEVENS; WAYNE D. MOORE; JOHN N. GILBERT, JR.; H. FLETCHER EGGERT, JR.; L. PALMER BROWN, III; SERENA MERCK; JOSEPH C. CORNWALL; STEVENS PEALE; HUGH C. O'ROURKE; MILES R. REHOR; UNDERWRITERS FOR LLOYD'S OF NEW YORK AND LLOYD'S, NEW YORK in solido, for legal interest on the sum of $33,698 deposited by the defendants in the registry of the Court from the date of judicial demand until the date of the deposit in Court.
We add the following paragraph to the judgment of May 1, 1978 for the purpose of including our award of penalties and attorney's fees within the judgment:
IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Motion for a New Trial filed by the plaintiff be granted and that there be judgment herein in favor of the plaintiff, Riverland Oil Mill, Inc., and against the defendants, LEIGHTON H. STEVENS; WAYNE D. MOORE; JOHN N. GILBERT, JR.; H. FLETCHER EGGERT, JR.; L. PALMER BROWN, III; SERENA MERCK; JOSEPH C. CORNWALL; STEVENS PEALE; HUGH C. O'ROURKE; MILES R. REHOR; UNDERWRITERS FOR LLOYD'S OF NEW YORK AND LLOYD'S, NEW YORK in solido in the full sum of SIXTY-FOUR THOUSAND, TWENTY-NINE AND 31/100 ($64,029.31) DOLLARS for penalties and in the full sum of SEVENTEEN THOUSAND FIVE HUNDRED AND NO/100 ($17,500.00) DOLLARS for attorney's fees.
For reasons assigned, the judgment as AMENDED is AFFIRMED at appellant's cost.
NOTES
[1] LSA-R.S. 22:658: "All insurers issuing any type of contract other than those specified in R.S. 22:656 and 22:657 shall pay the amount of any claim due any insured * * * within 60 days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest. Failure to make such payment within 60 days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured * * * together with all reasonable attorney's fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, 12% of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney's fees for the prosecution and collection of such amount * * *."