402 So.2d 292 (1981)
S. J. LeBLANC, Plaintiff-Appellee,
v.
UNDERWRITERS AT LLOYD'S, LONDON [1] and Norman Frederick Epps, Defendants-Appellants.
No. 8315.
Court of Appeal of Louisiana, Third Circuit.
July 22, 1981.
*293 Edward O. Taulbee, IV, Lafayette, for defendants-appellants.
Simon & Dauterive, Ana S. Calhoun, Lafayette, for plaintiff-appellee.
Before DOMENGEAUX, GUIDRY and CUTRER, JJ.
CUTRER, Judge.
This is a suit for the death of a thoroughbred yearling racehorse owned by the plaintiff. The colt was insured by Certain Underwriters at Lloyd's. The plaintiff, S. J. LeBlanc, made a claim for $35,000.00. The defendants refused payment contending there was no coverage because the plaintiff failed to comply with certain conditions contained in the policy; and that the policy was an actual value policy and that the plaintiff's loss was far less than $35,000.00.
The trial court rendered judgment in favor of the plaintiff for the full amount of the coverage, $35,000.00. The trial court also awarded the plaintiff attorney's fees and penalties. Defendants appeal. We affirm.
The issues presented on appeal are: (1) Whether there was coverage under the policy; (2) if coverage existed, a determination of the value of the racehorse at the time of death; and (3) whether penalties and attorney's fees were properly granted.
The testimony reveals that the sire of the bay colt was Bazaar and the dam, Turflike. He was foaled April 6, 1977. The bay colt was purchased as a weanling by the plaintiff's father, Pierre LeBlanc, from Mossleigh Farms. The plaintiff purchased the colt from his father in August 1977 for $5,000.00.
The plaintiff is a horse trainer who trains thoroughbreds. He also buys and sells horses for himself and other people as well as racing his own horses. He has been in this business for 25 years. He presently operates a farm with 41 stalls and owns 10 horses. On December 3, 1978, at about 2:00 or 3:00 P.M., one of the plaintiff's employees, Peter DeRousselle, noticed that the bay colt appeared ill. DeRousselle stated that the colt was pawing and rolling and that he believed the colt had colic. Plaintiff was in New Orleans and was unavailable. DeRousselle reported the behavior to Mrs. Le-Blanc who gave him two pills and some "Bute" to administer to the bay colt. DeRousselle did so and the colt responded well. At 5:00 P.M. DeRousselle fed the colt and found that his appetite was good. DeRousselle also testified that he had seen no signs that the colt was suffering from diarrhea.
The next morning DeRousselle found the colt dead. He reported this to the plaintiff who had returned during the night. The plaintiff reported the death to Bill North in Lexington, Kentucky. North had sold the insurance policy to plaintiff. At North's instructions, the plaintiff then called a veterinarian, Dr. J. W. Lambert, and asked him to perform an autopsy.
Dr. Lambert testified that he arrived at the plaintiff's farm shortly before dark and began his autopsy. He found pastings of *294 fecal material around the rectum and on the tail, indicating that the colt had diarrhea, or enterities of some type, otherwise known as colitis. He also found congestion and inflammation in the digestive tract, and some congestion in the lungs. The doctor took tissue samples, packaged them in formaldehyde and sent them to Texas A & M University for analysis. No findings were made because the tissue was too decomposed.
Plaintiff's claim was refused and this suit ensued.

POLICY COVERAGE
The defendant counsel asserts three grounds for denying coverage. First, he argues that the plaintiff was not the sole owner of the bay colt as required by the policy. The pertinent paragraph of the policy reads as follows:
"2. It is further warranted by the Assured that at the commencement of this Insurance he is the sole owner of each animal hereby insured or the specified shares. This Insurance shall cease to cover an animal immediately the Assured sells it or parts with any interest in it whatsoever, whether temporarily or permanently."
To substantiate the assertion that the plaintiff was not the sole owner of the bay colt, the defense points to a condition in the agreement between Pierre LeBlanc and Cletus Brown, Jr., owner of Mossleigh Farms, by which the elder LeBlanc purchased the bay colt. That condition reads:

"4) Brown retains ½ interest in breeding purposes only, in the event any of above colts are Stake Class, but will have possession during breeding career and have full control of all management of breeding." "The plaintiff stated that he had purchased the bay colt from his father subject to that condition. We find, however, that this did not prevent the plaintiff from being the "sole owner" within the ordinary popular sense of those words. Cletus Brown had only a contingent right to breeding the colt. In the event the bay colt proved to be "stake class," Brown would have the right to use the colt for breeding purposes and retain one-half of the proceeds. This arrangement is properly characterized as part of the consideration for the sale. Brown is not a co-owner. The defendant's argument is without merit.
The defense also argues that the plaintiff did not satisfy the conditions of the policy requiring that proper care and attention be given to each insured animal, that in the event of illness a veterinarian be employed and the insurer be notified. The provision relied on reads as follows:
"6. It is a condition precedent to any liability of the Underwriters hereunder that
(a) the Assured shall at all times provide proper care and attention for each animal hereby insured, and
(b) in addition, in the event of any illness, disease, lameness, injury, accident or physical disability whatsoever of or to an insured animal the Assured shall immediately at his own expense employ a qualified Veterinary Surgeon and shall, if required by the Underwriters, allow removal for treatment,
(c) in the event of the death of an insured animal the Assured shall immediately at his own expense arrange for a post-mortem examination to be made by a qualified Veterinary Surgeon, and
(d) in either event the Assured shall immediately give notice by telephone or telegram to the person or persons specified for the purpose in the Schedule, who will instruct a Veterinary Surgeon on the Underwriter's behalf if deemed necessary,
and any failure by the Assured so to do shall render the Assured's claim null and void and release the Underwriters from all liability in connection therewith, whether the Assured has personal knowledge of such events or such knowledge is confined to the representatives of the Assured or other persons who have care, custody or control of the animal(s)."
*295 In support of their contention that the bay colt did not receive proper care and attention, the defense relies heavily on the testimony of Dr. Robert Singer, expert in the field of veterinary medicine. He explained that colic is a serious, sometimes even fatal, condition in a horse. He felt that the horse should not have been left unobserved from the time of the evening feeding until the next morning, as revealed by his testimony set forth below:

"Q. Dr., in your experience, have you seen circumstances and occassions [sic] where a horse has been given some medication for colic, and the symptons [sic] had eased only to return again a short period later?

"A. That is not uncommon at all. Thats [sic] very common.

* * * * * *
"Q. If we assume, for the moment, that an animal was showing evidence of colic at 2 or 3 o'clock in the afternoon, and was given some type of medication, and the symptoms seemed to have been easing around 5:00 in the afternoon, when the animal was taking feed, what would be your opinion of proper veterinary management of the animal from that point later in the day?
"A. Well, the veterinary management, I would say, the horseman should know through his own experience. A veterinarian would advise him to currently or periodically observe him through a period of time until they were sure it had been corrected. As I mentioned, a horseman knows this, that he must watch him through the night, under those circumstances. I might add, I have been in situations where after treatment at 2:00 in the morning, we have been called back out.

"Q. Would the simple act of observation itself have significantly improved the horses [sic] chances of survival?

"A. In my opinion, yes, definitely."
Dr. Lambert testifying for the plaintiff, did not find the course of treatment substandard. Although he admitted that he would have advised further observation if he had been contacted, Dr. Lambert emphasized the fact that the bay colt was eating normally by 5:00 P.M. That portion of this testimony is as follows:
"A. Now, he states that at five (5:00) o'clock, as you heard his testimony, the horse was calm, looked normal, ate his feed. Would there be anything there to cause alarm?

"A. No, sir. Normally, the important thing you go by is the eating. If the animal is eating, you can pretty well say he's in good health. If he's not eating, you can look for a febrile condition, or fever, and then, look for inflammation. I guess that's the thing that not just myself, but a lot of veterinarians would ask their clients and say, `What is he eating?', so you can get an idea of the animals [sic] health in that one (1) question."

Considering the conflict in the expert testimony we cannot say that the trial court erred in holding that the bay colt received proper care and attention.
The defendants also argue that under sections (b) and (d) of condition 6, plaintiff's failure to immediately call in a qualified veterinary surgeon or to notify the defendants of the colt's illness relieves them of liability.
The requirement of immediate notice in an insurance policy means notice within reasonable time or without unnecessary delay. Reagan v. Mid-Continent Underwriters, Inc., 150 So.2d 75 (La.App. 4th Cir. 1963), writ ref'd, 244 La. 220, 151 So.2d 692 (1963). Here the horse showed his only signs of illness at around 2:00 or 3:00 P.M. on Saturday, December 2nd. At 5:00 P.M. of the same day he was thought to have been cured. We do not think that the requirement of immediate notice can be construed to require action within two hours. It would be unreasonable to require notice of illness where the horse had regained his health. Here the plaintiff's employee assumed that at 5:00 P.M. the bay colt had recovered and the reasonableness of this assumption was supported by the expert testimony of Dr. Lambert.
*296 The requirement that a qualified veterinary surgeon be immediately employed in the event of illness must also be interpreted to mean such employment will take place within a reasonable time, or without undue delay. Given the particular circumstances of this case we find that there was no such unnecessary delay.
The plaintiff contends that the policy provision requiring immediate employment of a veterinarian was met since LeBlanc's horses were under the continuing care of Dr. Lambert. Dr. Lambert testified that, although he was not the only veterinarian used by the LeBlancs, that he performed a large amount of work for them. He explained that he usually consulted with Mrs. LeBlanc on a continuing basis concerning the medical care of the horses at the Le-Blancs' farm. He stated that he dispenses medication to her and reviews its use with her. He further testified that it is usual in a large animal practice for a veterinarian to dispense medication for certain ailments to the owners. Frequently the medication is then administered, not by the veterinarian, but by the owners or their employees, such as grooms or dairy help. He stated that he had prescribed medication to the LeBlancs to be used in the case of colic, and that he had great confidence in DeRousselle's knowledge of horses and felt that he could certainly discern colic and administer medication.
Considering the continuing relationship between Dr. Lambert and the LeBlancs, the fact that the symptoms were common, albeit serious, and that appropriate medication to deal with such symptoms, according to Dr. Lambert's prior directions, was available, we find that it was not unreasonable for Mrs. LeBlanc to forego contacting a veterinarian until after she had tried the medication that had been prescribed by Dr. Lambert.

QUANTUM
Having determined that there is coverage, we next turn to the question of award. The trial judge awarded $35,000.00. In doing so the trial court relied heavily on the fact that $35,000.00 was indicated as the "Amount of Insurance," and cited LSA-R.S. 22:667 as controlling. That statute reads:
"In any case in which a policy includes coverage for loss of or damage to personal property of the insured, from whatever cause, if the insurer places a valuation upon the specific items of covered property and uses such valuation for purposes of determining the premium charge to be made under the policy, the insurer shall compute any covered loss of or damage to such property which occurs during the term of the policy at such valuation without deduction or offset, unless a different method is to be used in the computation of loss, in which latter case, the policy, and any application therefor, shall set forth in type of prominent size, the actual method of such loss computation by the insurer.
"The provisions of this section shall not apply to insurance of the kind referred to in Paragraph (3) of R.S. 22:6 when the coverage pertains to land vehicles nor shall the provisions of this section apply to any property used primarily for business purposes."

The evidence in this case clearly indicates that the bay colt was purchased primarily for business purposes. The plaintiff's entire business career focused on horse racing. Part of that business was racing his own horses. The policy of insurance itself indicates that the colt was to be eventually used for flat racing. Thus we find that R.S. 22:667 does not apply.
In the absence of such a statutory rule the terms of the policy must control. The policy clearly provides that in the event of the animal's death the assured will be indemnified for the actual value of the animal at the time of death but not exceeding the limit of liability which was $35,000.00.
As a consequence of our finding that this is an "actual value" policy we are faced with determining what the value of the bay colt was.
*297 The plaintiff testified that he had been training thoroughbred horses for 25 years. He had trained horses for racing at the various tracks located in several states. As to the colt in question, he purchased same from his father who was also a horse trainer. The purchase was made in August 1977 for a price of $5,000.00. Plaintiff stated that the colt was being trained at the time of death in December 1977. The colt had reached the galloping stage of training.
Plaintiff testified that he was the trainer of the mother of the colt in question. The mother, Turflike, had earned $38,000.00. He also had trained a sister of the colt in question. This animal was named Turflike Tiger which, according to plaintiff was a "nice filly." Plaintiff stated that he was well acquainted with the colt's background and the fact that such breeding would lend itself to producing a fast colt for futurity races. He stated that the confirmation of this bay colt was the best; that is, the physical appearance of the colt was the best. The colt was free of any physical defects. Other appealing aspects of this colt were that the colt was intelligent, making it one of the best that he had trained. The plaintiff stated that the colt had a good attitude, he wanted to run. These attributes and the fact that the colt was Louisiana bred, made the colt a good prospect for the futurity races that are run in Louisiana. The colt, if it had lived, would have been eligible to run in races that paid as much as $50,000.00 to $100,000.00 for winning Louisiana bred horses.
Plaintiff had trained horses for Kenneth Chaisson for several years. He stated that Chaisson had lost a horse through a broken leg and was looking for a replacement of the horse. Chaisson went to plaintiff's home in October 1977 looking for a colt to train for futurity racing. Plaintiff gave Chaisson the background statistics on the colt and showed the colt to Chaisson. After a discussion of the colt, Chaisson offered plaintiff $50,000.00 for the colt. Plaintiff stated that he would have to think over the offer. Two days later, plaintiff refused Chaisson's offer.
Shortly after this offer, plaintiff called the agent for Certain Underwriters and informed him that he wanted to insure the colt for $35,000.00. He told the agent that he had purchased the colt for $5,000.00 but had recently received the $50,000.00 offer. The agent issued the policy as requested and was paid four percent (4%) of the $35,000.00, or $1,400.00, as a premium.
Kenneth Chaisson, a floor covering contractor, testified that he is the owner of thoroughbred race horses. He had known the plaintiff for approximately 12 years. He stated that plaintiff had trained horses for him and he had a high regard for plaintiff's ability in the racehorse field.
After losing a horse in 1977, Chaisson was looking for a young colt to replace the lost horse. Chaisson stated that he went to plaintiff's home to inquire about purchasing the colt in question. Chaisson stated that he was well acquainted with the record of Bazaar, the colt's sire. He stated that Bazaar had a record at Acqueduct race track that has never been broken. He was also familiar with the sister of the colt, Turflike Tiger, which impressed him after seeing her work. He stated that he was interested in futurity racing (short distance racing that paid well). This colt's background showed that he would be well qualified for this type of racing. He also stated that the confirmation of this colt was perfect.
Chaisson explained that futurity races are quite lucrative and this is what influenced him to make the $50,000.00 offer. His testimony in this regard is as follows:
"THE COURT: Mr. Chaisson, fifty thousand ($50,000.00) dollars is a lot of money for a horse. And, of course, you hadn't bought one in thatI mean, twenty thousand was the highest one.
"A. Right.
"THE COURT: What was it, in particular, about this horse that you were willing to offer that kind of money. And, furthermore, it didn't seem to me that there was any trading, any negotiation. In other words, you could have started a whole lot lower.

*298 "A. Right. They have this gig futurity every year. It averages anywhere from ninety, a hundred, a hundred and something. And this horse was qualified for it.

"THE COURT: Qualified how do you mean? In other words,(Interrupted)
"A. Because he was Louisiana bred, he could run in this futurity. With a little luck, he could have run first, second, third. If he wins, it, the horse is worth three (3) times that, plus you'd get all your money back in one (1) shot.
"THE COURT: You were looking for a horse to run in this particular futurity?
"A. That particular futurity there, yes, ma'am, because I had won the one the year before with another one of my horses.
"THE COURT: I see. How much did you win?
"A. Then, this was the breeder sales futurity, they were sixteen thousand eight hundred."

* * * * * *
"Q. How many races this horse would have been eligible to run, and do you know what, maybe, the aggregate or the total of the purses that he would have been eligible?
"A. On the low side, three hundred thousand, and then, the owner gets sixty (60%) percent of that.
"Q. So, you relied on you had the pedigree, you saw the horse, you saw his sister, you were willing to risk fifty thousand ($50,000.00) dollars?
"A. Right. And the horse was developed young. That's the kind of horse you can make money with fast at them short distances. It don't take long."
Several witnesses were qualified as experts in the evaluation of thoroughbred horses. Dr. Lambert, who testified as an expert in veterinary medicine, was also accepted as an expert in this field. When questioned in the area he testified as follows:
"Q. Now, what is the bottom line as to what a horse is worth?
"A. What you can get for him.
"Q. And by that, I understand, a willing buyer and a willing seller, and they agree on a price, that's what a horse is worth?
"A. Yes, sir."
Bud Thibodeaux testified that he has a pedigree service and is a blood stock agent. He has had extensive experience buying and selling thoroughbreds. He stated that a top priority in appraising a horse is his physical appearance. He stated other factors are involved, however, such as background, intelligence, etc. He testified extensively as to the bay colt's blood lines and to performance of the horse's relatives. He never actually set a value on the bay colt except to say that if there was a standing offer of $50,000.00 for the bay colt then it was worth $50,000.00 to the owner. He agreed with Dr. Lambert that a horse is worth whatever you can get for him. He stated that a price of $50,000.00 would have to put the bay colt among the top 2% in price for sales of Louisiana bred yearlings. He stated that a half-sister of the bay colt sold for $42,000.00. Thibodeaux stated that plaintiff was one of the top trainers in Louisiana and would accept his recommendations in regard to racehorses.
The defendants' expert, Robert Erie Waldman, also testified that a price of $50,000.00 would put the bay colt among the top 2% of Louisiana yearlings. After testifying regarding the bay colt's blood lines, with particular attention to Bazaar's record as a sire; that is, the prices and performances of other horses sired by Bazaar, Waldman stated that if the bay colt looked good he would value him at $5,000.00. He went further and said that given the other factors involved, if the bay colt's confirmation was excellent; that is, if he was the "absolute best looking colt that one could imagine to see" he still wouldn't have been worth more than $10,000.00. Mr. Waldman disagreed with the plaintiff's experts, saying that a standing offer to purchase a horse at a particular price meant nothing to him in terms of appraising the value of a horse.
*299 All of the experts agreed, however, that the process of appraising a race horse is extremely speculative. The plaintiff's experts emphasized the gamble involved. They noted that some very moderately priced horses became worth millions, with successful racing careers. It was further explained that the bay colt had been developing very early, a trait typical of colts with the same sire. This, coupled with the fact that he was Louisiana bred, made him a prime candidate for several futurities within the State. The testimony revealed that these races for two year olds could be quite lucrative. Mr. Chaisson was particularly interested in the bay colt for just these reasons. He had been successful in futurity racing in the past and thought this colt might also prove a winner.
Due to the nature of the subject matter, we consider the standing offer of $50,000.00 by Chaisson to be of considerable significance. It is apparent that a race horse cannot be appraised according to comparable sales and, of course, there is no possibility of replacing the individual animal and replacement costs cannot be calculated as it would be for an inanimate object such as a home or an automobile.
In the case of Mercer v. St. Paul Fire & Marine, 318 So.2d 111, 114 (La.App. 3rd Cir. 1975), the question of evaluating lost property was discussed. In that case the court was faced with the task of evaluating property that had been bought as salvage and then lost in a fire. The fact that it was salvage and that the extent of the previously existing damage to the property was undeterminable made it virtually impossible to determine a market value. The court, quoting from 61 A.L.R.2d 711 at 713, summarized different approaches to arriving at actual value. After discussing the market data and replacement costs approached, the court then observed as follows:
"In recent years, a number of courts, seeking to effectuate more complete indemnity, have adopted a third method, the broad evidence rule, to determine actual cash value of property at the time of loss. Under this rule, the trier of facts may consider any evidence logically tending to the formation of a correct estimate of the value of the insured property at the time of loss.
"Generally, it may be said that the proper test or criterion of actual cash value in a particular case depends upon the nature of the property insured, its condition, and other circumstances existing at the time of loss."
The court also held that:
"... The touchstone for the court in determining actual cash value is the basic principle that an adequately insured person should incur neither economic gain nor loss...."
After considering all the factors involved, the expert testimony and the tenuous nature of racehorse evaluation, we conclude that the plaintiff has proven that it is more probable than not that he suffered economic loss to the full extent of the policy limits of $35,000.00.

PENALTIES AND ATTORNEY'S FEES
The trial court awarded penalties and attorney's fees pursuant to LSA-R.S. 22:658. Attorney's fees were set at $2,500.00. The defendants' denial of coverage was based on its interpretation of the conditions contained in the policy as applied to the facts of this case.
In the case of Carney v. American Fire and Indemnity Company, 371 So.2d 815 (La. 1979), the Louisiana Supreme Court stated:

"An insurer's liability to pay penalties and attorney's fees is based on whether their action in denying coverage is arbitrary, capricious and without probable cause. LSA-R.S. 22:658. An insurer must take the risk of misinterpreting its policy provisions. If it errs in interpreting its own insurance contract, such error will not be considered as a reasonable ground for delaying the payment of benefits, and it will not relieve the insurer of the payment of penalties and attorney's fees. Albert v. Cuna Mutual Insurance Society, 255 So.2d 170 (La.App. 3rd Cir. 1971), and cases therein cited."

*300 Under these principles, the defendants in this case took the risk of misinterpreting the insurance contract. They erred in their interpretation and such error will not be considered a reasonable ground for refusing to pay benefits. Such error cannot relieve the defendants from paying penalties and attorney's fees.
The inquiry does not, however, stop with the question of coverage. The defendants point out that the trial court erred in applying LSA-R.S. 22:667 and therefore failed to make a determination of the actual cash value of the bay colt. They also state that there was a serious question as to the value of the colt. They then argue that there should be no award of penalties or attorney's fees where there is an honest debate on the value of the loss. We disagree.
There was never any question that the plaintiff suffered a loss in this case. The policy itself revealed that the colt had been purchased for $5,000.00 and the defendants' expert at trial stated that if the colt had good confirmation he would have been worth from $5,000.00 to $10,000.00. The defendants made no tender of any amount, however.
Where there is a reasonable dispute as to the amount of loss, the insurer can avoid the imposition of penalties and attorney's fees by unconditionally tendering the part of the claim which is undisputed. Nations v. Excess Insurance Company, 377 So.2d 433 (La.App. 2nd Cir. 1979); Riverland Oil Mill v. Underwriters for Lloyd's, 368 So.2d 156 (La.App. 3rd Cir. 1979), writ den., 369 So.2d 1365 (La.1979); Foster v. Western World Ins. Co., 339 So.2d 395 (La. App. 1st Cir. 1976). Due to defendants' failure to tender the undisputed portion of the value assigned the colt, they cannot now rely on that dispute as to value to escape the penalties provided by LSA-R.S. 27:658. The trial court properly awarded penalties and attorney's fees.
For the foregoing reasons, the judgment of the trial court is affirmed. The costs of this appeal are assessed to defendants-appellants.
AFFIRMED.
NOTES
[1] Underwriters at Lloyd's, London was named as the insurer. This was error. The insurer was Certain Underwriters at Lloyd's (Underwriters) with Norman Epps as apparently the agent for Certain Underwriters. The answer was filed on behalf of the latter parties.