999 So.2d 1104 (2008)
LOUISIANA BAG COMPANY, INC. and Lapac Manufacturing, Inc.
v.
AUDUBON INDEMNITY COMPANY.
No. 2008-C-0453.
Supreme Court of Louisiana.
December 2, 2008.
*1106 Gieger, Laborde & Laperouse, L.L.C., Robert Irwin Siegel, Carson Wayne Strickland, New Orleans, for applicant.
Allen & Gooch, Robert Anthony Robertson, Lafayette, for respondent.
KIMBALL, J.
We granted certiorari in this matter to review whether an insurer, who fails to *1107 tender the undisputed portions of a claim within the thirty-day time period provided by La. R.S. § 22:658, has acted in a manner that is arbitrary, capricious or without probable cause. For the reasons that follow, we find that the court of appeal correctly concluded under the facts of this case that defendant failed to tender payment of the undisputed portions of the claim within the statutorily mandated time period, and that such failure was arbitrary, capricious or without probable cause. Accordingly, the judgment of the court of appeal is affirmed.

FACTS
On all pertinent dates, Plaintiffs Louisiana Bag Company, Inc. and LaPac Manufacturing, Inc. (collectively referred to as "Louisiana Bag") were insured under a commercial property insurance policy, policy number SMP570410, issued by Defendant Audubon Indemnity Company ("Audubon"). The policy was a renewal policy, and insured Louisiana Bag's manufacturing plant, multiple warehouse facilities and movables located on those premises against the risk of fire. Specifically, the Audubon policy provided the following coverages: (1) $1,285,240.00 for the building; (2) $2,000,000.00 for stock, on a blanket basis; (3) $61,345.00 for contents; (4) $23,874.00 for electronic data processing equipment ("EDP"); and (5) $2,500.00 for EDP media.
On April 20, 2003, a fire destroyed Louisiana Bag's manufacturing plant and warehouse facilities. Louisiana Bag thereafter reported its loss to Audubon, and Audubon hired Bill Adams to adjust the property damage caused by the fire.
On April 22, 2003, Mr. Adams performed his first inspection of the property. At that time, Mr. Adams estimated that the damage to the building would exceed the policy limits in the Audubon policy. While at the loss site, following his initial inspection, Mr. Adams reported to Nancy Cooper, Vice President of American International Group ("AIG"),[1] that the total loss caused by the fire would range between $7,000,000 and $9,000,000, and that the building and stock policy limits appeared to be approximately $1,100,000 and $2,000,000, respectively.
On May 2, 2003, Audubon, through Lorenzo Spencer, AIG's claim overseer responsible for administering Louisiana Bag's fire claim on behalf of Audubon, received Mr. Adams' initial report (issued April 25, 2003). In his first report, Mr. Adams stated that the policy limits "as per the coverage proposal provided by the insured are $1,285,240 on buildings, $61,345 on office contents, $2,000,000 blanket on stock, $23,874 for EDP-Owned Equipment and $2,500 for EDP-Media." Mr. Adams further provided an "Estimate of Loss," in which he estimated the following losses sustained by Louisiana Bag:

Building: $ 1,285,240.00 (Policy Limits)
Contents: $ 61,345.00 (Policy Limits)
Stock: $ 2,000,000.00 (Policy Limits)
EDP Owned Equipment: $ 23,874.00 (Policy Limits)
EDP-Media: $ 2,500.00 (Policy Limits)
 ______________
Total: $ 3,372,959.00

Below his summary of loss estimates, Mr. Adams stated: "It appears at this time the insured has a loss well in excess of the policy limits for buildings, stock, etc. and the deductible can be applied to the overall loss." Mr. Adams characterized the "entire structure" as a "complete total loss," and noted that there did "not appear to be any salvageable contents, stock or building items."[2] In addition, Mr. Adams informed *1108 Mr. Spencer that he did not yet have an actual copy of the insurance policy, and notified him that there was a potential issue regarding whether the policy provides per location or blanket coverage.
Specifically with regard to the building, in his initial report, Mr. Adams estimated that the replacement cost for the destroyed building would be approximately "$2,000,000 which well exceeds the stated policy limit for the buildings of $1,285,240." Mr. Adams also noted that it was unknown at the time whether the concrete slab would be reusable, but stated that "it would appear that there will be areas of the slab where spalling of the concrete has taken place which would necessitate repairs even if sections of the slab are reusable." Mr. Adams further noted that it might be "necessary at some point to hire a construction consultant to pinpoint the replacement cost of the building."[3]
With regard to the stock, Mr. Adams informed Mr. Spencer in the same initial report that Louisiana Bag indicated to him that there was approximately $3,000,000 worth of finished product in the building. Mr. Adams noted that this figure was impossible to verify because the entire building was "completely reduced to ashes" and all of the product was "burned out of site." As such, Mr. Adams advised Mr. Spencer that he had retained BCS Certified Public Accountants ("BCS") to review Louisiana Bag's records to ascertain the extent of the stock loss.
Mr. Adams further reported to Mr. Spencer that he requested that Louisiana Bag compile an inventory of all lost office contents, EDP equipment and EDP media, and noted that he anticipated that Louisiana Bag would "be able to support that they had [a loss] in excess of the policy limits" for all three categories of loss. Mr. Adams further informed Mr. Spencer that, while he was unsure whether the policy provided for debris removal, Louisiana Bag's agent informed him that he believed the policy provided $10,000 for such. If that were the case, Mr. Adams opined that there would be "substantial expenses" for debris removal. Finally, Mr. Adams again notified Mr. Spencer that there may be an question regarding whether the policy provided blanket coverage.
On June 2, 2003, Audubon received Mr. Adams' second report (issued May 27, 2003). In this report, Mr. Adams summarized the same policy limits and the same Estimate of Losses as supplied in his initial report, again stating that the loss was "well in excess of the policy limits." Mr. Adams again noted that he was still waiting for a copy of the actual policy and that *1109 there was a potential blanket coverage issue. Mr. Adams also updated Mr. Spencer as to BCS's investigation into the stock loss, and again suggested to Mr. Spencer that Audubon secure the services of a building consultant to complete a more detailed replacement estimate for the building. Mr. Adams opined that, "in all probability, the face value of the coverage amounts for the building at the loss location will be owed." Finally, Mr. Adams informed Mr. Spencer that Louisiana Bag had requested an advance payment of $500,000.
Also on June 2, 2003, Mr. Adams sent an email to Mr. Spencer formally recommending that Audubon hire a building consultant to perform a more detailed replacement estimate for the building. Mr. Adams thereafter retained the services of Unified Building Sciences, Inc. ("UBS") to compile a replacement cost for the destroyed building.
On June 18, 2003, BCS, the accounting firm hired by Audubon to estimate Louisiana Bag's stock loss, reported to Mr. Adams that Louisiana Bag's stock loss was $3,601,931.00 or $3,639,148.00, depending on the methodology used to calculate the loss. Based on BCS's understanding that Louisiana Bag's stock policy limit was $2,000,000, BCS opined that "it appears that the insured has exceeded these limits, under both methods, and therefore the collectible loss value would be $2,000,000."
On June 24, 2003, Audubon received Mr. Adams third report (issued June 20, 2003). In this report, Mr. Adams again summarized the same policy limits and the same Estimate of Losses as supplied in his initial and second reports, and again stated that the loss was "well in excess of the policy limits." Mr. Adams again noted that he had not yet received the insurance policy and that there was still a question whether the policy provided blanket coverage.
With regard to the building, Mr. Adams stated that UBS verbally contacted him during the week of June 16, 2003, and advised him that its estimate for the destroyed building would be approximately $1,500,000. With regard to the stock, Mr. Adams informed Mr. Spencer that BCS's stock loss investigation found that Louisiana Bag had suffered a confirmed stock loss of approximately $3,600,000.
With regard to the other classes of loss, Mr. Adams enclosed with his third report a summary provided by Louisiana Bag of its office contents and EDP equipment lost in the fire, which totaled $101,500 for office contents and $56,800 for EDP equipment. Given the respective policy limits of $61,345.00 for office contents and $23,874 for EDP equipment, Mr. Adams stated that it "appears both limits will be exceeded." Finally, Mr. Adams informed Mr. Spencer that Louisiana Bag, having not yet received an advance from Audubon, had again requested an advance payment. In response, Mr. Adams noted that "it appears at this time ample information is available to warrant a substantial advance payment." Mr. Adams asked Mr. Spencer to advise him if Audubon concurred with the request for an advance payment of $750,000.
On June 26, 2003, Mr. Adams sent Mr. Spencer an email informing him that Louisiana Bag had called him several times regarding an advance payment. Mr. Adams noted to Mr. Spencer that they had received the accountant's report showing that the stock loss was "well in excess of $2,000,000 which is the blanket policy limit" as well as a verbal report from UBS indicating that the building suffered damages "in excess of $1,500,000 which exceeds the policy limit for the building of $1,285,000." He also reminded Mr. Spencer that Louisiana Bag had indicated that they had already spent in excess of *1110 $1,000,000 on, among other things, debris removal and acquisition of replacement stock. In this email, Mr. Adams requested that Mr. Spencer advise him as to Audubon's decision regarding an advance payment, stating that it "would appear a $1,000,000 advancement payment is in line."
On June 27, 2003, Mark Landry, Louisiana Bag's broker, emailed Mr. Adams to inform him that Louisiana Bag was becoming "impatient." On the same day, Mr. Spencer emailed John Cerami[4] stating that "the exposure information is accurate as the loss should settle at about $3,3750,000 [sic]." Mr. Spencer also requested that Mr. Cerami forward him a copy of the actual insurance policy, because he had been using a copy of the coverage proposal provided when the policy was being negotiated until this date. He also asked Mr. Cerami to verify that coverage was written on a blanket basis. Finally, Mr. Spencer urged Mr. Cerami that he needed to "O.K. a partial payment today." Mr. Cerami responded that he would try to get an email verifying the requested information that afternoon, but that Mr. Spencer would have to request a copy of the policy from another person. Mr. Cerami made no mention of the requested partial payment.
Also on June 27, 2003, UBS sent Mr. Adams its formal replacement cost estimates for the building. UBS estimated that the building and slab would cost $1,391,579 to completely replace, and that the building alone would cost $733,812 to replace excluding the concrete slab (i.e., assuming that the slab could be reused or repaired).
On July 8, 2003, Louisiana Bag received a $1,000,000 advance payment from Audubon. Also on July 8, 2003, approximately two and a half months after the fire, AIG delivered a certified copy of the actual insurance policy to Messrs. Spencer and Adams. The policy confirmed that the stock coverage was on a blanket basis.
On July 21, 2003, Audubon received Mr. Adams' fourth report (issued July 17, 2003). In this report, Mr. Adams noted that he received the insurance policy and verified coverage. He further noted that a review of the policy indicated that a change endorsement modified the stock coverage to a blanket basis with a limit of $2,000,000.[5] Mr. Adams requested that Audubon seek a legal opinion as to whether coverage was afforded on a per location or blanket basis (hereinafter, the "coverage opinion"). Mr. Adams also found that the building policy limit was actually $1,178,590, rather than $1,285,240, as he had previously stated. Mr. Adams again noted that the loss was "well in excess of the policy limits."
Also in this fourth report, Mr. Adams notified Mr. Spencer of UBS's replacement cost estimates for the building. Although he requested and received a cost estimate for replacement of both the building and the slab and the building alone, Mr. Adams noted that an "evaluation of the repairability [sic] of the slab foundation has not been conducted at this time." As such, Mr. Adams informed Audubon that it might "be necessary to secure the services of an engineer to inspect the concrete slab foundation to determine its repairability [sic]."
*1111 With regard to the stock, Mr Adams again noted that Louisiana Bag's stock loss was approximately $3,600,000 and that the policy limit for this loss was $2,000,000. Finally, Mr. Adams asked Mr. Spencer to advise him on hiring an engineer to inspect the slab.
On August 15, 2003, UBS updated its reconstruction estimate and opined that total reconstruction of the building including repair of the concrete slab would cost approximately $1,430,641.82.
On August 25, 2003, Audubon received Mr. Adams fifth report (issued August 21, 2003). In this report, Mr. Adams revised his initial estimates and suggested a "Revised Reserve Recommended" amount of $3,266,500.00. Mr. Adams again noted that the loss was "well in excess of the policy limits." With this report, Mr. Adams also enclosed a proposed statement of loss in which he concluded that the claimed loss approximated $5,190,872.82. After application of the policy limits for buildings, stock, office contents and EDP equipment/media (combined), Mr. Adams calculated the claim to be $3,266,309. Taking into account the July 8, 2003, $1,000,000 advance, Mr. Adams formally recommended a net concluding payment of $2,266,306.00.
In arriving at this figure, Mr. Adams calculated the replacement cost of the building to be $1,402,457.28. Consequently, he recommended that Audubon pay the full policy limit of $1,178,590.[6] Mr. Adams further calculated the stock loss value to be approximately $3,601,931.00, and consequently recommended that Audubon again pay the full blanket policy limit of $2,000,000. With regard to the office contents and EDP equipment/media, Mr. Adams calculated Louisiana Bag's losses to approximate $101,500.00 and $56,800.00, respectively. Therefore, he again recommended that Audubon pay the full policy limits for the contents and EDP equipment/media of $61,345.00 and $26,374.00, respectively.
Having arrived at his figure, Mr. Adams recommended to Mr. Spencer in his fifth report that a sworn statement of loss in the amount of $2,266,309 be forwarded to Louisiana Bag in order to conclude the claim. Finally, he noted that there was an outstanding claim for debris removal which could not be addressed until Louisiana Bag completed debris removal and submitted its claim therefore. As such, Mr. Adams formally recommended closing the claim for the building, stock, office contends and EDP equipment/media for $3,266,309, minus the previously-advanced $1,000,000.
On August 27, 2003, the coverage opinion was rendered by the law firm retained by Audubon, opining that the insurance policy provided blanket coverage for Louisiana Bag's stock losses.
On September 12, 2003, Mr. Spencer emailed James Down in Audubon's claims department informing him of the coverage opinion and stating that Louisiana Bag was threatening a bad faith lawsuit. Mr. Spencer requested payment of $500,000 for the next week and the balance for the following week.
On October 8, 2003, Louisiana Bag received a $500,000 check from Audubon. On October 30, 2003, Louisiana Bag received checks for $1,678,590 and $87,719, bringing their total payments from Audubon to $3,266,309. On February 19, 2004, Louisiana Bag received a supplemental check for $12,500 for debris removal, bringing their total claim payment to $3,278,809.
*1112 On October 30, 2003, Louisiana Bag filed suit in the Fifteenth Judicial District Court against Audubon, asserting its entitlement to unpaid policy limits as well as penalties and attorney fees for Audubon's failure to comply with the statutory time limits pursuant to La. R.S. § 22:658.[7] After a bench trial in which the trial court heard testimony from Messrs. Adams, Spencer, Landry and Peter Michael John (the owner of Louisiana Bag), judgment was rendered in favor of Audubon. Specifically, the trial court found that Louisiana Bag failed to prove that Audubon's failure to provide timely payment was arbitrary, capricious or without probable cause. The trial court cited several factors that made Audubon's delay reasonable in its eyes, including (1) the blanket coverage question, (2) Audubon's request that Louisiana Bag fill out and return Audubon's proof of loss forms,(3) the slab re-use issue, and (4) Audubon's decision to await a copy of the insurance policy.[8]
The court of appeal, Third Circuit, reversed, ruling that Audubon was provided with satisfactory proof of loss of the damage sustained to the building, its contents and stock "at least by the end of August of 2003." Louisiana Bag Co., Inc. v. Audubon Indemnity Co., 07-1103 (La. App. 3 Cir. 1/30/08), 975 So.2d 187, 191. Finding that all payments should have been tendered within thirty days of this date, the court of appeal found that Audubon failed to make timely payment for the policy limits for Louisiana Bag's building, stock, contents, and EDP losses, and that such failure was arbitrary and capricious. Id. at 193. The court of appeal also found that Audubon had a duty to tender the undisputed portions of the claim in a timely manner regardless of any unresolved debris and personal effects claims. Id. at 194. Consequently, the court of appeal assessed Audubon a penalty of twenty-five percent of the remaining and unpaid policy limits relative to the building, stock, office contents and EDP equipment/media, and ordered Audubon to pay Louisiana Bag twenty-five percent of $2,266,309, or $566,599.75. Id. at 195. This court granted certiorari, 08-0453 (La.4/25/08), 978 So.2d 356.

DISCUSSION
A cause of action for penalties under La. R.S. § 22:658 requires a showing that (1) an insurer has received satisfactory proof of loss, (2) the insurer fails to tender payment within thirty days of receipt *1113 thereof, and (3) the insurer's failure to pay is arbitrary, capricious or without probable cause. La. R.S. § 22:658.[9] Audubon does not dispute the court of appeal's finding that it received satisfactory proof of loss "at least by the end of August of 2003." Furthermore, the record reflects that, with the exception of a $1,000,000 advance payment on July 8, 2003, Audubon did not make any other payments to Louisiana Bag until October 8, 2003. As such, the only issues before this court are whether Audubon's delay in payment was arbitrary, capricious or without probable cause, and whether the court of appeal properly applied the manifest error standard in so deciding.
Audubon alleges that neither the court of appeal nor Louisiana Bag can identify any specific incidents of conduct that is arbitrary and capricious, and that, in awarding penalties, the court of appeal therefore effectively eliminated Louisiana Bag's burden of proof under La. R.S. § 22:658 and instead placed the burden on Audubon to disprove such conduct on its part. In addition, Audubon asserts that the court of appeal disregarded its duty to review the trial court's judgment under a manifest error standard. In support of both of these contentions, Audubon contends that the trial court correctly found that the stock coverage and slab re-use questions, the subrogation investigation, Audubon's request for its sworn proof of loss form, and Louisiana Bag's lingering debris removal and personal effects claims were all legitimate and reasonable reasons to delay payment that preclude penalties under La. R.S. § 22:658.
In response, Louisiana Bag alleges that the record is replete with evidence establishing Audubon's arbitrary and capricious conduct in failing to timely pay the claim. Louisiana Bag notes that the court of appeal pointed to numerous specific examples of arbitrary, capricious, or vexatious behavior and correctly found that Audubon had no reasonable basis to withhold payment after late August 2003. Specifically, Louisiana Bag contends that Audubon's above-named concerns were insufficient to justify delaying payment and that Audubon had a duty to tender timely payment of the undisputed portions of the claim regardless of any alleged lingering debris removal or personal property claims. Louisiana Bag thus concludes that the trial *1114 court was manifestly erroneous because it disregarded established jurisprudence regarding the payment of undisputed portions and the lack of formality required for a proof of loss.
Turning now to what is arbitrary, capricious or without probable cause, this court has previously stated in Reed v. State Farm Auto. Ins. Co., 03-0107 (La.10/21/03), 857 So.2d 1012, that the New Oxford English American Dictionary defines an "arbitrary" act as one "`based on random choice or personal whim, rather than reason or system,'" and capricious as "`given to sudden and unaccountable changes in behavior.'" Id. at 1020. The phrase "arbitrary, capricious, or without probable cause" is synonymous with "vexatious," and a "vexatious refusal to pay" means "unjustified, without reasonable or probable cause or excuse." Id. at 1021. See also La. Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London, 616 So.2d 1250, 1253 (La.1993). Both phrases describe an insurer whose willful refusal of a claim is not based on a good-faith defense. Reed, 857 So.2d at 1021. See also La. Maint., 616 So.2d at 1253.[10]
This court has also stated that penalties should be imposed only when the facts "negate probable cause for nonpayment." Guillory v. Travelers Ins. Co., 294 So.2d 215, 217 (La.1974). See also Crawford v. Al Smith P. & H. Serv., Inc., 352 So.2d 669, 673 (La.1977); McDill v. Utica Mut. Ins. Co., 475 So.2d 1085, 1092 (La. 1985). An insurer's conduct depends on the facts known to the insurer at the time of its action, and this court has declined to assess penalties "when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense." Reed, 857 So.2d at 1021 (citing Block v. St. Paul Fire & Marine Ins. Co., 32,306 (La.App. 2 Cir. 9/22/99), 742 So.2d 746, 752, 754). Specifically, when there is a "reasonable and legitimate question as to the extent and causation of a claim, bad faith should not be inferred from an insurer's failure to pay within the statutory time limits when such reasonable doubts exist." Id. (citing Block, 742 So.2d at 752).[11] In these instances, when there are substantial, reasonable and legitimate questions as to the extent of an insurer's liability or an insured's loss, failure to pay within the statutory time period is not arbitrary, capricious or without probable cause.
While an insurer need not tender payment for amounts that are reasonably in dispute, this court has explicitly found that "there can be no good reason"  or no probable cause  for withholding an undisputed amount. Hammett v. Fire Ass'n of Philadelphia, 181 La. 694, 160 So. 302, 304-05 (1935).[12] Where there is a substantial, *1115 reasonable and legitimate dispute as to the extent or amount of the loss, the insurer can avoid the imposition of penalties only by unconditionally tendering the undisputed portion of the claim. McDill, 475 So.2d at 1091. See also LeBlanc v. Underwriters at Lloyd's, London, 402 So.2d 292, 300 (La.App. 3 Cir.1981). This court held in McDill that an insurer cannot "stonewall" an insured simply because the insured is unable to prove the exact extent of his damages. McDill, 475 So.2d at 1091. Where the exact extent of the damages is unclear, an insurer must tender the reasonable amount which is due. Id. We have defined the "amount that is due" as "a figure over which reasonable minds could not differ." Id. at 1092.
In McDill, there was a dispute over the exact extent of the plaintiff's injuries from an automobile accident. Id. However, there was "little question" that the defendant insurer had some liability to the insured and that the plaintiff's claim would clearly exceed the primary coverage limits. Id. The McDill court found that, where the plaintiff's medical bills all but deleted the $10,000 primary coverage, the insurer had to have been fully apprised that it had some liability to the insured and that, had the insurer tendered "some reasonable amount," it would not have been arbitrary and capricious and the penalty provision would have been inapplicable. Id. However, because the insurer was fully apprised of at least some loss, but failed to tender the uncontested amount, the McDill court found that the insurer had been arbitrary, capricious or without probable cause, and levied penalties against it. Id.[13]
*1116 In sum, an insurer need not pay a disputed amount in a claim for which there are substantial, reasonable and legitimate questions as to the extent of the insurer's liability or of the insured's loss. Reed, 857 So.2d at 1021. However, an insurer must pay any undisputed amount over which reasonable minds could not differ. McDill, 475 So.2d at 1092. Any insurer who fails to pay said undisputed amount has acted in a manner that is, by definition, arbitrary, capricious or without probable cause, Hammett, 160 So. at 304-05, and will be subject to penalties therefore on "the difference between the amount paid or tendered and the amount found to be due." La. R.S. § 22:658.
In the instant case, the facts in the record establish that a significant, four-month investigation was conducted by Audubon through its own experts, all of which indicated that Louisiana Bag suffered a total loss. For example, Mr. Adams stated in five of his reports submitted to Mr. Spencer that "[i]t appears at this time the insured has a loss well in excess of the policy limits for the buildings, stock, etc." Mr. Adams also repeatedly restated the same policy limits and the same estimates of loss, all of which were in excess of the stated policy limits. Mr. Adams also characterized the "entire structure" as a "complete total loss," and stated in all five reports that there "do not appear to be any salvageable contents, stock or building items."[14] Consequently, throughout his reports, Mr. Adams was consistent in his assessment: Louisiana Bag had suffered a total loss potentially in excess of the policy limits. Therefore, by late August, 2003, since Audubon was in receipt of satisfactory information with which it was capable of calculating its liability and its adjuster, Mr. Adams formally recommended tendering payment to the full extent of the policy limits. Nonetheless, for each class of loss, Audubon raised an issue that it asserted created a reasonable dispute as to the extent of Louisiana Bag's loss sufficient to justify a legitimate delay in payment.
For example, Audubon asserted that it could not pay Louisiana Bag's stock loss claim until it received an opinion from its own legal counsel stating that it provided blanket stock coverage to Louisiana Bag. We find this argument without merit because an insurer has a duty to pay the undisputed portion of the claim within the statutory time period, there was no legitimate blanket coverage question as to the extent of Audubon's liability, and an insurer bears the risk of misinterpreting its own policy.
First, assuming arguendo that there was a legitimate issue as to the extent of Audubon's coverage by reason of the blanket coverage question, Audubon nevertheless had a duty under penalty to pay the undisputed portion of the claim within the statutory time period. McDill, 475 So.2d at 1092; Hammett, 160 So. at 304-05. Audubon was made aware that Louisiana Bag had suffered a confirmed stock loss of approximately $3,600,000, as calculated by Audubon's own expert, BCS, on June 24, 2003. Neither Louisiana Bag nor Audubon contested BCS's $3,600,000 figure. As such, the approximate stock loss was not in dispute. Moreover, in his June 24, 2003 *1117 report, Mr. Adams stated that "it appears at this time ample information is available to warrant a substantial advance payment," and suggested an advance payment of $750,000 to Audubon, to which Audubon made no reply. Moreover, had the blanket coverage issue been resolved in Audubon's favor, Audubon would have remained liable to Louisiana Bag for the per location policy limit of $750,000. Therefore, at a minimum, $750,000  the lesser of the two potential coverages owed by Audubon to Louisiana Bag  was undisputed, and Audubon's failure to tender this undisputed amount within the statutory time period is, by definition, arbitrary, capricious or without probable cause. As we have previously stated: "[t]here can be no good reason why the insurance company should withhold that [undisputed] amount from the insured." Hammett, 160 So. at 304-05. Reasonable minds could not have differed that this amount was due. McDill, 475 So.2d at 1092. For this reason, Audubon's failure to tender said amount within the statutory time period subjects it to penalties under La. R.S. § 22:658 on the difference between the amount paid or tendered and the amount found to be due.
Second, we note that there was no legitimate blanket coverage question as to the extent of Audubon's liability. Audubon had received the coverage opinion provided by its own legal counsel by September 1, 2003. By that date, it was aware that coverage was provided on a blanket basis and that it was liable for the full $2,000,000. Nonetheless, timely payment of the entire $2,000,000 within thirty days thereof was not forthcoming. In addition, had Audubon not had the benefit of its legal counsel's coverage opinion, Louisiana jurisprudence is clear that, when there is a dispute over the extent of coverage afforded by an insurance policy, the insurer bears the risk of misinterpreting its own policy and will be liable for penalties for its errors. Carney v. Am. Fire & Indem. Co., 371 So.2d 815, 819 (La.1979). This court has found that an insurer "must take the risk of misinterpreting its policy provisions," and that, if an insurer "errs in interpreting its own insurance contract, such error will not be considered as a reasonable ground for delaying payment of benefits, and it will not relieve the insurer of the payment of penalties and attorney's fees." Id. (citing Albert v. Cuna Mut. Ins. Soc'y, 255 So.2d 170 (La.App. 3 Cir.1971)). "In other words, insurers should not have their policy provisions interpreted at the expense of the insured, especially when they are charged with knowledge of their policy's contents." Id.[15] In short, Audubon's potential error in the interpretation of its insurance contract was not a reasonable ground for refusing timely payment. Therefore, Audubon could not avoid the payment of penalties for its delay in tendering payment within the statutorily mandated time period by reason of its interpretation of the coverage afforded by its policy.
Audubon also asserted that it could not pay Louisiana Bag's building loss claim until it received adequate information regarding the condition of the slab. *1118 Again, we find this argument to be without merit because an insurer has a duty to pay the undisputed portions of a claim, the investigation into the slab's condition was delayed, and Audubon received adequate information regarding the condition of the slab by late August.
First, Audubon had a duty to tender the undisputed portion of the building claim within the statutorily mandated time period regardless of the slab's condition. McDill, 475 So.2d at 1092; Hammett, 160 So. at 304-05. Similar to the stock loss discussed above, Audubon was apprised before late August that, at a minimum, the building itself (excluding the slab) was a total loss. Audubon was informed on June 24, 2003, that UBS, the firm hired by Audubon to calculate the building loss, had verbally contacted Mr. Adams and had provided an estimate of approximately $1,500,000 to replace the destroyed building. Moreover, Mr. Adams informed Audubon in his fourth report, received by Audubon on July 21, 2003, that UBS formally estimated that the building and slab would cost $1,391,579 to completely replace, while the building alone would cost $733,812 to replace (assuming that the slab could be reused or repaired). It was in this July 21, 2003, report that Mr. Adams also noted that an "evaluation of the repairability [sic] of the slab foundation has not been conducted at this time," and recommended retaining an engineer to inspect the slab. Therefore, at this time, Audubon was aware that it would be liable to Louisiana Bag for, at a minimum, $733,812, the price to rebuild the building alone, assuming that the slab was completely reusable. We find that reasonable minds could not have differed that this amount was undisputed and therefore due within the statutory time period. McDill, 475 So.2d at 1092. Audubon's expert estimated that this was the minimum amount due if the slab was completely reusable. Moreover, neither Audubon nor Louisiana Bag contested the figures provided to Audubon by UBS. Consequently, there could be "no good reason," or no probable cause, why Audubon did not tender this amount within thirty days. Hammett, 160 So. at 304-05. Audubon's failure to tender this undisputed amount was again, by definition, arbitrary, capricious or without probable cause. Id.
Second, we note that the entire building loss, including the slab loss, was due by late September, for two reasons. First, the investigation into the slab's condition was delayed. Mr. Adams first alerted Audubon to the potential slab issue in his May 2, 2003 initial report, in which Mr. Adams informed Audubon that it was unknown at the time whether the concrete slab would be reusable, noted that repairs would be necessary even if it were reusable, and stated that it might be "necessary at some point to hire a construction consultant to pinpoint the replacement cost of the building." Nonetheless, Audubon did not retain UBS building consultants to estimate the value of the building until June 2, 2003, when it received Mr. Adams' second report (in which he again recommended retaining UBS) and when Mr. Adams emailed Mr. Spencer formally recommending retaining UBS. Moreover, Audubon retained UBS to calculate only the loss amounts, not to inspect the slab's condition. Audubon did not request an evaluation of the slab's condition until after receiving Mr. Adams's fourth report on July 21, 2003, in which Mr. Adams recommended that it might "be necessary to secure the services of an engineer to inspect the concrete slab foundation to determine its repairability [sic]." We find that Audubon's three month delay in assessing the slab's condition despite knowledge that it was the slab's condition would be an issue should not accrue to Audubon's favor.
*1119 Finally, irrespective of Audubon's duty to pay the uncontested $733,812 building-reconstruction cost and its belated investigation into the slab's condition, we note that UBS issued an updated estimate of $1,430,641.82 for the total building loss, including the cost of repairing the concrete slab, on August 15, 2003. Therefore, by late August, Audubon was aware of the uncontested $733,812 to repair the building and of UBS's similarly uncontested estimate for the entire building loss, including the slab. Consequently, there could be "no good reason" why Audubon did not tender timely payment of this greater undisputed amount within the statutorily mandated time period. Hammett, 160 So. at 304-05. Reasonable minds could not have differed that this amount, too, was reasonably due. McDill, 475 So.2d at 1092. For this reason as well, Audubon's failure to tender said amount within the statutory time period subjects it to penalties under La. R.S. § 22:658.
Audubon has also asserted generally that it could not pay any class of loss, including the contents and EDP equipment/media losses, until it received a copy of the insurance policy. First, more than two months passed before Audubon requested and obtained a copy of its insurance policy. For example, Mr. Adams informed Audubon that he had not yet received a copy of the insurance policy and that potential coverage issues existed in his May 2, 2003 initial report, his June 2, 2003 second report, and his June 24, 2003 third report. Audubon took no immediate action to provide Mr. Adams with a copy of the insurance policy or to address the potential coverage questions allegedly created by it. Audubon did not request a certified copy of the insurance policy until June 27, 2003, two months after the fire and after three notifications by Mr. Adams that he was without a copy thereof. Moreover, after Audubon's request, the policy was delivered in eleven days, on July 8, 2003. We do not believe that Audubon's delay in requesting its own policy should mitigate in its favor, particularly in light of the well-established principle that Audubon, as the insurer, is charged with knowledge of its policy's contents. Carney, 371 So.2d at 819.
In addition, Mr. Adams received the policy on July 8,2003, and the blanket coverage issue was resolved by September 1, 2003. Therefore, there were several undisputed amounts by this date. As we have stated above, failure to tender those undisputed amounts within the statutorily mandated time period was, by definition, arbitrary, capricious or without probable cause. Hammett, 160 So. at 304-05.
The trial court was also persuaded that Audubon was reasonable in delaying payment until after it had received its proof of loss forms from Louisiana Bag. It is well settled that a "satisfactory proof of loss" is only that which is "sufficient to fully apprise the insurer of the insured's claims." McDill, 475 So.2d at 1089. See also Hart v. Allstate Ins. Co., 437 So.2d 823, 828 (La.1983). In addition, with regard to the form of a proof of loss, this court has stated that proof of loss is a "flexible requirement to advise an insurer of the facts of the claim," and that it need not "be in any formal style." Sevier v. U.S. Fid. & Guar. Co., 497 So.2d 1380, 1384 (La.1986). "As long as the insurer receives sufficient information to act on the claim, `the manner in which it obtains the information is immaterial.'" Id. Therefore, the assertion that Audubon's form of proof of loss was required is unsupported by the governing jurisprudence. Furthermore, it is undisputed by the parties that satisfactory proof of loss was received by late August, 2003, as determined by the court of appeal. Therefore, an insurer's requirement that it receive its form of proof of loss before payment is *1120 insufficient to create probable cause to delay payment. To allow an insurer to do so would frustrate the intent and purpose of La. R.S. § 22:658 as it would allow the insurer to be solely in control of when proof of loss is received.
Finally, we turn to the contention that Audubon could not tender payment of the entire claim until Louisiana Bag's lingering claims for debris removal and personal effects, submitted in January 2004, were resolved. Audubon contends that these claims created reasonable doubt as to the amount of covered losses in late August 2003, and that this reasonable doubt was sufficient reason to delay payment. As we have stated, regardless of any disputed amounts in a claim for which there are substantial, reasonable and legitimate questions as to the extent of its insurer's liability or of the insured's loss, an insurer must still pay any undisputed amount over which reasonable minds could not differ. McDill, 475 So.2d at 1092. Any insurer who fails to pay said undisputed amount has acted in a manner that is, by definition, arbitrary, capricious or without probable cause. Hammett, 160 So. at 304-05. Therefore, while Audubon's argument that the remaining claims for debris removal and personal effects created reasonable doubt as to the total extent of its liability may have merit, it does not relieve Audubon of its responsibility as dictated by statute to remit those portions of the claim that were not in dispute.
To summarize, we find that, by late August 2003, Audubon had knowledge of undisputed portions of the stock, contents, EDP equipment/media and building loss claims. The record reflects that Audubon did not tender these undisputed portions within the statutorily mandated time periods. An insurer has a recognized right to withhold payment of disputed amounts in a claim for which there are substantial, reasonable and legitimate questions as to the extent of its insurer's liability or of the insured's loss. Reed, 857 So.2d at 1021. However, an insurer also has a recognized duty to pay any undisputed amount over which reasonable minds could not differ. McDill, 475 So.2d at 1092. Moreover, an insurer who fails to pay said undisputed amounts has acted in a manner that is, by definition, arbitrary, capricious or without probable cause. Hammett, 160 So. at 304-05. Applying this legal framework to the instant case, we find that Audubon acted in a manner that was arbitrary, capricious or without probable cause when it failed to tender payment for the undisputed portions of the stock, contents, EDP and building losses within the statutorily mandated time period. In addition, we find that the reasons asserted by Audubon, which it alleged created reasonable doubt as to the full extent of the claim, were insufficient to relieve Audubon of its duty to pay the undisputed portions of the claim.
In arriving at this decision, we recognize that La. R.S. § 22:658 is penal in nature, that it is to be strictly construed and that the stipulated sanctions should be imposed "only in those instances in which the facts negate probable cause for nonpayment." McDill, 478 So.2d at 1092. In addition, we are aware that whether an insurer's action was arbitrary, capricious or without probable cause is essentially a fact issue to be determined by the trial court and not to be disturbed on appeal absent manifest error. Reed, 857 So.2d at 1021. However, we are also cognizant that the trial court's determination will be reversed when it is not supported by the record. Id. As correctly found by the court of appeal, the record in the instant case does not support the finding that Audubon acted with any "reason or system" in failing to timely tender payment of the undisputed portions of the claim. *1121 Id. at 1020 (an "arbitrary" act is one "`based on random choice or personal whim, rather than reason or system'"). To the contrary, Audubon's actions appear "based on random choice or personal whim," and were thus "unjustified and without reasonable or probable cause or excuse." Id. at 1021 ("vexatious refusal to pay" means "unjustified, without reasonable or probable cause or excuse"). This fact is well illustrated by Mr. Spencer's reason for failing to tender timely payment. When asked why he didn't tender a larger advance payment than the $1,000,000 advance, Mr. Spencer responded at trial: "I didn't feel comfortable." When asked again why he didn't tender a larger payment than the $500,000 payment issued October 8, 2003, after the substantial conclusion of Audubon's investigation by late August 2003, Mr. Spencer again responded: "[f]or whatever reason, I didn't feel comfortable going beyond the half million dollar payment at this time." However, this response is inconsistent with Mr. Spencer's September 12, 2003, email to James Down in the claims department, in which Mr. Spencer requested payment of $500,000 for the next week and the balance for the following week. Such inconsistencies seem to us as "based on random choice or personal whim, rather than reason or system" or "given to sudden and unaccountable changes in behavior." Id. at 1020. That Mr. Spencer was "uncomfortable" is "unjustified, without reasonable or probable cause or excuse," and insufficient to serve as a reasonable basis for delaying payment of the undisputed portions of the claim. Id. See also La. Maint., 616 So.2d at 1253.
Moreover, we have specifically defined an insurer's failure to tender timely payment of an undisputed amount as conduct that is without probable cause. McDill, 478 So.2d at 1092; Hammett, 160 So. at 304-05. In addition, we have clearly stated that an insurer bears the risk of misinterpreting its own policy. Carney, 371 So.2d at 819. The trial court's finding that Audubon was reasonable in delaying payment due to the unresolved slab re-use and blanket coverage questions, among other things, was therefore erroneous as the law clearly states that undisputed portions must be paid and that Audubon bore the risk of misinterpreting its own policy. In short, none of the issues regarding the extent of Audubon's liability cited by the trial court were legally sufficient to delay payment of the undisputed portions of the claim.
We now turn to the argument that Louisiana Bag failed to identify any specific conduct by Audubon that was arbitrary, capricious or without probable cause. While we find Mr. Spencer's above referenced comments noteworthy, among other facts, a review of this court's jurisprudence suggests that proof of specific acts or proof of the insurer's state of mind is generally not required to establish conduct that is arbitrary, capricious or without probable cause. See, e.g., La. Maint., 616 So.2d 1250; Hart, 437 So.2d 823; McDill, 475 So.2d 1085; Stracener v. U.S. Fid. & Guar. Co., 420 So.2d 1101 (La.1982); Guillory, 294 So.2d 215. A review of the applicable jurisprudence illustrates that it is "sufficient that the vexatious character of the insurer's refusal to pay can reasonably be found from a general survey of all the facts in evidence, specific evidence thereof not being necessary." 14 Couch on Insurance 3d § 204:108. "That is to say, direct and positive evidence of vexatious refusal is not necessary to impose the statutory penalty." 14 Couch on Insurance 3d § 204:108.
We find significant proof in a general survey of the record of the vexatious character of Audubon's refusal to pay. For example, Audubon was notified by its adjuster, Mr. Adams, from the inception of *1122 the investigation that Louisiana Bag had suffered a total loss well in excess of the policy limits. In addition, Mr. Adams notified Audubon of Louisiana Bag's demands for payment and was offered no response when suggesting partial payments be made. While Audubon may have arguably been justified in withholding payment early on, Audubon was not justified in continuing to withhold payment after its own experts rendered reports showing damage well in excess of the policy limits for the stock and building losses. Rather than tendering these payments, Audubon focused on the policy coverage and slab re-use issues to delay payment. However, irrespective of these questions, Audubon did not tender the undisputed portions of these claims within the statutorily mandated time periods and after these questions were answered. Rather, Audubon required that its proof of loss form be completed, cited admittedly unimportant cause and origin, subrogation and arson investigations and co-insurance calculations, and, finally, relied on lingering claims regarding debris removal and personal effects  all with the outcome of delaying timely payment. When asked why he refused to tender timely payment, Mr. Spencer was stated that, "[f]or whatever reason, I didn't feel comfortable." Moreover, we briefly note that an insurer need only fail to tender one undisputed portion of the claim to be subject to penalties on the difference between the amount paid or tendered and the amount found to be due. La. R.S. § 22:658. In the case sub judice, Audubon failed to tender timely payment of the undisputed portions of the stock, building, contents and EDP claims, any one of which would have been sufficient to render Audubon liable under La. R.S. § 22:658 for the difference between the amount paid, $1,000,000, and the amount found to be due, $3,266,309. Given the significant information presented to Audubon by its own experts, the uncontested nature of those experts' calculations, and Mr. Spencer's loss for a reasonable basis for denying timely payment for any of the undisputed portions, we find that the court of appeal correctly applied the manifest error standard in overturning the trial court and finding that Audubon's failure to tender timely payment was arbitrary, capricious or without probable cause.

DECREE
For the foregoing reasons, we find that the trial court committed manifest error when it found that Audubon had not acted in a manner that was arbitrary, capricious or without probable cause, and we affirm the court of appeal's decision to this regard. Specifically, we find that Audubon was arbitrary, capricious or without probable cause when it failed to tender the undisputed portions of Louisiana Bag's claim within the statutorily mandated time period.
AFFIRMED
NOTES
[1] While the record is unclear, it suggests that AIG was also involved in the adjustment of this claim.
[2] Mr. Adams also stated:

[I]t was quickly determined the entire building ... is a total loss. All of the exterior and interior walls had collapsed inward and the roof collapsed onto the concrete slab foundation. The majority of stock, raw materials, packaging materials, etc in the interior of the building have been reduced to ashes and there is virtually nothing to see within the interior of the building. It must be noted portions of the building were still on fire during the initial inspection and access was not available to many of the interior sections of the building.
[3] Mr. Adams also informed Mr. Spencer that he had retained Unified Investigations and Sciences ("UIS") to conduct a cause and origin investigation so as to determine the cause of the fire because there were "several theories as to how the fire started." Mr. Adams indicated that the intent of UIS's investigation would be to determine, first, if arson was implicated, and second, if there were any opportunities for subrogation  i.e., to determine if another entity might be responsible for the fire. Mr. Adams testified at trial that arson was ruled out as early as May 27, 2003. In addition, Audubon admitted at trial that the cause and loss investigation had nothing to do with its delay in payment. Finally, the trial court recognized that the potential subrogation claims did not relieve Audubon of its duty to timely pay Louisiana Bag. Counsel for Audubon admitted at trial that Audubon's obligation to make timely payment to Louisiana Bag was "independent of the subrogation claim."
[4] The record reflects that Mr. Cerami was also involved in the adjustment of this claim as an employee of A1 Risk of Baton Rouge.
[5] The record reflects that the change endorsement was issued on July 7, 2003, but made retroactive to the policy's inception, to rectify a mistake made when the policy was issued. Specifically, the policy originally issued mistakenly provided per location coverage rather than blanket coverage, as the parties had agreed. Audubon issued the change endorsement to rectify this error.
[6] Mr. Adams applied the $2,500 policy deductible to the gross loss amount for the building.
[7] The only issue raised by the parties before this court is penalties under La. R.S. § 22:658.
[8] The trial court also cited the time needed for Audubon to calculate co-insurance amounts and the time needed for Audubon to finish its cause and origin investigation, which included the arson and subrogation investigations.

As stated above, Mr. Adams indicated that the intent of cause and origin investigation was to determine, first, if arson was implicated, and second, if there were any opportunities for subrogation. Mr. Adams testified at trial that arson was ruled out as early as May 27, 2003. In addition, Audubon admitted at trial that the cause and loss investigation had nothing to do with its delay in payment. Finally, the trial court recognized that the potential subrogation claims did not relieve Audubon of its duty to timely pay Louisiana Bag. Counsel for Audubon admitted at trial that Audubon's obligation to make timely payment to Louisiana Bag was "independent of the subrogation claim." As such, we do not address whether the cause and origin investigation, including the arson and subrogation issues, was a sufficient reason for delay.
In addition, we note that the co-insurance calculation did not result in any reduction in payment. More importantly, Mr. Adams testified that the co-insurance calculation was preliminarily completed by June 2003, and completely finished by August 21, 2003. Therefore, we again do not address whether the co-insurance calculation was a sufficient reason for delay.
[9] La. R.S. § 22:658 (2003) provided, in pertinent part:

A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:656, R.S. 22:657, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.
....
(4) All insurers shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim.
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of twenty-five percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, twenty-five percent of the difference between the amount paid or tendered and the amount found to be due.
La. R.S. § 22:658 (2003), effective August 15, 2003.
[10] In the context of workers' compensation law, we have defined arbitrary and capricious behavior as "`willful and unreasonable action, without consideration and regard for the facts and circumstances presented.'" Reed, 857 So.2d at 1021, fn. 8 (citing J.E. Merit Constructors, Inc. v. Hickman, 00-0943 (La. 1/17/01), 776 So.2d 435, 437).
[11] See also Guillory, 294 So.2d at 217 (penalties should be denied when there exists a "substantial issue" as to liability); Warner v. Liberty Mut. Fire Ins. Co., 543 So.2d 511, 515 (La.App. 4 Cir.1989) (a "reasonable disagreement... as to amount of a loss" is not subject to penalties); Sibley v. Insured Lloyds, 442 So.2d 627, 632 (La.App. 1 Cir.1983) (same).
[12] In Hammett, we stated:

"If the defendant believed that the assured's claim was excessive, it had the right, after determining what it considered was the proper amount of the loss or damage, to tender that sum and litigate over the balance.... It must also be borne in mind that the insurance company, under the provisions of the statute, can avoid the imposition of the major part of the penalty by tendering the amount it determines is due. There can be no good reason why the insurance company should withhold that [undisputed] amount from the insured. The company can likewise avoid the entire penalty by tendering the correct amount of the loss." (emphasis added).
Hammett, 160 So. at 304-05.
See also Mallett v. McNeal, 05-2322 (La. 10/17/06), 939 So.2d 1254, 1263, in which we most recently recognized in passing the "duty to render unconditional payments to insureds as mandated by La. R.S. 22:658."
[13] Appellate courts have similarly found en masse that an insurer's failure to tender the undisputed portion of the claim within the statutory time period is arbitrary, capricious or without probable cause, and will lead to the imposition of penalties. See, e.g., Holmes v. Motors Ins. Corp., 277 So.2d 472, 474 (La. App. 4 Cir.1973) (where there is a valid dispute over the total amount owed, and "where an insurer makes its own estimate of damages and costs and does not tender that amount within the statutory time, such action is arbitrary and capricious and the insured is entitled to recover the penalty"); Bauman v. Hanover Ins. Co., 353 So.2d 1058, 1059 (La.App. 2 Cir.1977) ("in cases where the claim is compounded of `multiple elements, some of which are not in dispute,' the insurer's failure to timely pay those elements admittedly due is held to be `without probable cause' and does subject the insurer to penalties on the `total amount of the loss' ... unless there has been a timely partial payment or tender by the insurer to the insured of the element of the loss admittedly due") (emphasis in original); Deville v. La. Farm Bureau Mut. Ins. Co., 378 So.2d 457, 460 (La.App. 3 Cir.1979) ("The insurer cannot avoid payment of penalties and attorney's fees if it fails to make an unconditional tender of a sum clearly due under the policy"); Sibley, 442 So.2d at 632 ("However, if part of a claim for property damage is not disputed, failure of the insurer to pay the undisputed portion of the claim within the statutory delay will subject the insurer to liability for penalties on the entire claim. To avoid imposition of penalties in such a situation, the insurer must unconditionally tender to the insured that part of the claim for which there is no dispute"); Landry v. State Farm Ins. Co., 529 So.2d 417, 426 (La.App. 1 Cir. 1988) ("an insurer can avoid paying penalties and attorney's fees by unconditionally tendering the undisputed amount of the claim in cases where there is reasonable disagreement over the total amount owed"); Warner, 543 So.2d at 515 ("Without doubt, an insurer cannot rely upon a dispute as to the value of a loss to escape the penalty provisions of LSA-R.S. 22:658 if the insurer has not unconditionally tendered the undisputed portion of the claim").
[14] Mr. Adams also stated:

[I]t was quickly determined the entire building... is a total loss. All of the exterior and interior walls had collapsed inward and the roof collapsed onto the concrete slab foundation. The majority of stock, raw materials, packaging materials, etc in the interior of the building have been reduced to ashes and there is virtually nothing to see within the interior of the building. It must be noted portions of the building were still on fire during the initial inspection and access was not available to many of the interior sections of the building. (emphasis added).
[15] See also LeBlanc, 402 So.2d at 300 ("defendants [the insurer] in this case took the risk of misinterpreting the insurance contract. They erred in their interpretation and such error will not be considered a reasonable ground for refusing to pay benefits. Such error cannot relieve the defendants from paying penalties and attorney's fees"); Chrysler Credit Corp. v. Dairyland Ins. Co., 491 So.2d 402, 405 (La.App. 1 Cir.1986) ("An insurer must take the risk of misinterpreting its own policy provisions. If it makes an error in interpretation, that error will not be considered as a reasonable ground for delaying payment of benefits, and will not relieve the insurer of the payment of penalties and attorney's fees").